[Sac. No. 7600. In Bank. Jan. 27, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ALEX
VICTOR, Defendant and Appellant.

Milton L. McGhee for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Edward W. Hinz, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

SCHAUER, J.*—Defendant appeals from an order committing him to the custody of the Director of Corrections as a person "in imminent danger of becoming addicted to narcotics," for placement in the narcotic addict rehabilitation program purportedly pursuant to article 3, chapter 11, title 7, of part III of the Penal Code (§§ 6500-6510, which deal with commitment of "persons not charged with a crime").

Defendant contends that the statute authorizing his involuntary commitment as a person "in imminent danger of becoming addicted" is unconstitutionally vague and is beyond the police power of the State; properly construed, however, the statute is not vulnerable to either attack.

But defendant further argues that the superior court lacked jurisdiction to entertain proceedings to commit him pursuant to Penal Code sections 6500 to 6510 after judgment of conviction of a crime had been entered against him, sentence had been imposed and partially suspended, and while he was confined in jail as a condition of probation. We have concluded that the latter contention is meritorious and hence that the order of commitment should be reversed.

On December 11, 1962, defendant pleaded guilty in municipal court to the misdemeanor of possession of narcotic paraphernalia (Health & Saf. Code, § 11555). According to the minutes of that court it was thereupon "Adjudged, that defendant is guilty of the crime of possession of narcotic paraphernalia (11555 H & S Code) and that he be imprisoned in the San Joaquin County Jail for 180 days.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Ordered one day suspended. Credit for time served. Commitment issued.'' (People's Ex. 4.) A court has no power to suspend part or all of a sentence except as an incident to granting probation (Pen. Code, §§ 1203, 1203.1, 1203a) ; therefore, when a court after pronouncing judgment and sentence of imprisonment orders part or all of the sentence to be suspended, such order is deemed to be an ''informal'' but effective grant of probation. (*Oster* v. *Municipal Court* (1955) 45 Cal.2d 134, 139 [3-4] [287 P.2d 755], and cases there cited). It follows as a matter of law that in the case at bench the municipal court must be held to have imposed sentence on defendant,[1] then summarily granted him probation and as a condition thereof ordered him confined in the county jail for 179 days, less time already spent in custody. (For a similar ruling, see *People* v. *Wallach* (1935) 8 Cal.App.2d 129, 133 [3] [47 P.2d 1071].)

On February 19, 1963,—i.e., *while defendant was still confined in jail* as a condition of probation—the district attorney filed a petition in the superior court to commit defendant to the California Rehabilitation Center pursuant to Penal Code section 6500.[2] On the basis of that petition two physicians were appointed, examined defendant, and filed their reports concluding that defendant was ''in imminent danger of becoming addicted to narcotics.'' At a hearing held on April 5, 1963 (nearly four months after defendant's ''commitment'' to jail) the court found defendant to be ''in imminent danger of becoming addicted to narcotics'' and ordered him committed as such to the narcotic addict rehabilitation program. (Pen. Code, § 6506.) Defendant demanded and received a jury trial (Pen. Code, § 6508), but the jury likewise found that he was ''in imminent danger of becoming addicted'' to narcotics.

### Cost of Transcripts on Appeal

This is the first appeal to reach us from an order of com-

---

[1] The 180-day term imposed is the maximum for this offense. (Health & Saf. Code, § 11716.)

[2] At the time here relevant section 6500 provided: ''A sheriff, chief of police, minister, physician, probation officer, a relative, friend or any other person who believes that a person is addicted to the use of narcotics or by reason of the repeated use of narcotics is in imminent danger of becoming addicted to their use or any person who believes himself to be addicted or about to become addicted may report such belief to the district attorney who may petition the superior court for a commitment of such person to the Director of Corrections for confinement in the narcotic detention, treatment and rehabilitation facility.'' (The 1963 amendment to this section (Stats. 1963, ch. 1706, § 9) is not here pertinent.)

mitment to the custody of the Director of Corrections for placement in the narcotic addict rehabilitation program. In his notice of appeal, prepared in propria persona, defendant requested transcripts of the commitment proceedings. Apparently treating the matter as an ordinary civil appeal, the reporter presented defendant with a demand for prepayment of the estimated cost ($200) of such transcripts. Defendant filed an affidavit of indigency, stating that he had no funds to prepay such costs. The district attorney thereupon moved to dismiss the appeal for failure to deposit with the clerk the estimated cost of the transcripts. After argument, the court denied the motion to dismiss and ordered that "the Record on Appeal be prepared and the cost of it be borne by the County."

This ruling was proper. In *In re De La O* (1963) 59 Cal. 2d 128, 156 [20] [28 Cal.Rptr. 489, 378 P.2d 793], we stated that "the commitment procedures set up by the subject statute are analogous to the civil commitment procedures of the Sexual Psychopathy Law, and by the same analogy and for the same reasons an original order of commitment under Penal Code section 6450 is 'appealable as a final judgment in a special proceeding under section 963 of the Code of Civil Procedure.' (*People* v. *Gross* (1955), *supra,* 44 Cal.2d 859, 860 [2] [285 P.2d 630], and cases there cited.)" In an earlier stage of the *Gross* case (*Gross* v. *Superior Court* (1954) 42 Cal.2d 816, 821 [5a-5b] [270 P.2d 1025]), the petitioner sought mandate to compel preparation at the state's expense of transcripts of the proceeding in which he was adjudged a sexual psychopath. We granted the relief prayed for, reasoning as follows: "The proceeding is not strictly a criminal case . . . yet it is to be noted it has some of the features pertinent to such cases. The state is defendant's opponent. The one sought to be declared a sexual psychopath is entitled to bail pending determination. [Citations.] He is entitled to be present at the hearing and if he has no counsel the court may appoint one for him or order the public defender to serve. [Citation.] His liberty is at stake. Since those things are matters pertaining to the protection and rights of a person similar to one involved in a criminal case we believe he falls within the terms of section 69952 of the Government Code [providing for payment of transcript fees out of the county treasury]. See *In re Paiva,* 31 Cal.2d 503 [190 P.2d 604]; *People* v. *Smith,* 34 Cal.2d 449 [211 P.2d 561].)" ■ Similar considerations obtain here and

lead us to the same conclusion, i.e., that persons involuntarily committed to the custody of the Director of Corrections under this program have the right to a free transcript on an appeal from the order of commitment.

*Lack of Jurisdiction to Entertain Commitment Proceedings*

To resolve the jurisdictional issue it is necessary to view the statutes in their setting. The legislation establishing a program of civil commitment of narcotics addicts and those ''in imminent danger'' of addiction is found in chapters 11 and 12 of title 7, part III of the Penal Code. (See generally *In re De La O* (1963) *supra*, 59 Cal.2d 128; Notes, 1 San Diego L.Rev. (1964) 58; 8 Utah L.Rev. (1962-1964) 367.) ▇ Articles 2 and 3 of chapter 11 provide two distinct commitment procedures, ostensibly differentiating between ''Persons Charged with a Crime'' (art. 2) and ''Persons not Charged with a Crime'' (art. 3). Such headings, however, do not affect the scope, meaning, or intent of the legislation (Pen. Code, § 10004; *In re De La O* (1963) *supra*, 59 Cal.2d 128, 137 [1]) and it appears that in practice the distinction actually observed is between persons who have been brought to trial *and ''convicted''* (which in this context means whose guilt of crime has been established by plea, verdict, or finding) and those who have not.[3]

Far more serious, though, is the confusion which has been engendered by the very fact that there are two such distinct statutory mechanisms for the commitment of addicts to the same rehabilitation program: article 2 simply declares (in Pen. Code, §§ 6450 and 6451) that proceedings brought thereunder ''shall be conducted in substantial compliance with Sections 5353, 5053, 5054, and 5055 of the Welfare and Institutions Code,'' whereas article 3 undertakes to spell out in detail (Pen. Code, §§ 6502-6508) the various steps required in processing a petition for commitment filed under its provisions. Our continuing concern with the fair and effective administration of the narcotic commitment program constrains us to examine the experience of the courts with the

---

[3]Thus in numerous instances the addict has come to the attention of the authorities by being arrested and charged with a crime (e.g., illegal possession of narcotics), but the charge has subsequently been dropped and commitment proceedings have been instituted under article 3 (see, e.g., *In re Butler* (1963) 59 Cal.2d 157 [28 Cal.Rptr. 508, 378 P.2d 812]). This is not improper, for the narcotic commitment law does not restrict the district attorney's discretion to request dismissal of a criminal action in the interests of justice (Pen. Code, § 1385). But clarity would be promoted if the headings were made to conform with this practice.

actual operation of the statutory scheme following our decision upholding its constitutionality in *In re De La O* (1963) *supra*, 59 Cal.2d 128. That experience, insofar as revealed to us, prompts the following observations:

First, the wholesale importation into article 2 of the listed provisions of the Welfare and Institutions Code (§§ 5353, 5053, 5054, and 5055) has proven to be costly and inefficient. As we observed in *In re Jones* (1964) 61 Cal.2d 325, 328, fn. 3 [38 Cal.Rptr. 509, 392 P.2d 269], ''The Legislature could not have intended literal compliance with all of the provisions of sections 5053, 5054 or 5055 of the Welfare and Institutions Code. These sections were enacted to provide a hearing procedure for mentally irresponsible persons. For that reason, if taken literally, they would be, in part, inappropriate for a civil narcotics commitment procedure.'' In an effort to minimize this patent inappropriateness the Legislature provided that in commitments under article 2 there need only be ''substantial compliance'' with the listed Welfare and Institutions Code sections. But the introduction of this element of uncertainty into an already novel procedure appears to have created more problems than it has solved. For example, if the statute referred to expressly requires the attendance at the hearing of ''at least two medical examiners'' (Welf. & Inst. Code, § 5053), can the attendance of any *less* than two be countenanced? How could the attendance of only one examiner (as appears in the case at bench) constitute ''substantial compliance'' with a requirement that there be ''at least two''?[4] To further complicate matters, jurisdiction to enter an order of civil commitment to the narcotic addict rehabilitation program ''depends on *strict compliance with each of the specific statutory prerequisites for maintenance of the proceeding.*'' (Italics in original.) *(In*

---

[4]Similarly, both article 2 (Pen. Code, §§ 6450 and 6451 as amended) and article 3 (Pen. Code, § 6508) declare that after an order of commitment is entered the person affected ''may demand a hearing by a judge or jury in substantial compliance with the provisions of Section 5125 of the Welfare and Institutions Code.'' The latter section specifies, *inter alia*, that ''the court shall set the case for hearing at a date, or shall cause a jury to be summoned and to be in attendance at a date stated, *not less than five nor more than 10 days* from the date of the demand for a court or jury trial.'' (Italics added.). In the case at bench defendant's demand for a jury trial on the issue of addiction was made on April 15, 1963, but that trial was not held until May 8, 1963 (and the record shows no continuances in the interim either requested or consented to by defendant). Is a delay of 23 days ''in substantial compliance'' with the requirement of a trial ''not less than five nor more than 10 days'' after the demand?

*re Raner* (1963) 59 Cal.2d 635, 639 [4] [30 Cal.Rptr. 814, 381 P.2d 638].) ■ It follows that in processing a petition for narcotic commitment under article 2 the prosecuting attorney and the court must, as the law now stands, (1) decide which requirements of the listed Welfare and Institutions Code sections are to be observed in order that the committing procedure be ''in substantial compliance'' with those sections, and then (2) conduct the commitment procedure in ''strict'' compliance with the requirements thus selected. In view of the mental gymnastics necessary to accomplish this feat with any consistency it is not surprising that a substantial number of narcotic commitments, although supported by ample evidence of addiction, have had to be set aside for failure to accord the defendant full measure of his statutory rights.

Secondly, no compelling reason has appeared in practice to justify the difference between the commitment procedures prescribed in article 2 and article 3.[5] We do not imply that there should be no provisions for prosecution of the criminal trial until determination of guilt, for suspension of the criminal proceedings, and for certification or transfer of the defendant to an appropriate civil court. ■ Society has a recognized interest in prompt determination of guilt or

---

[5]We refer only to the difference in procedures, not in the standards of general eligibility for the rehabilitation program. In setting such standards the Legislature could justifiably (1) vest the superior court with discretion to decline to institute commitment proceedings against a felon-addict if ''in the opinion of the judge the defendant's record and probation report indicate such a pattern of criminality that he does not constitute a fit subject for commitment'' (Pen. Code, § 6451), and (2) declare to be ineligible persons convicted of certain crimes of violence (Pen. Code, § 6452). Not so easily justifiable is the declared ineligibility of persons convicted of narcotics violations with minimum terms in excess of five years (Pen. Code, § 6452), i.e., in most cases persons with two or more prior convictions. To the extent that such persons may be repeated users or addicts who have thus demonstrated their inability to voluntarily and independently avoid involvement with illegal narcotics, they could include some who might be most in need of compulsory treatment. In this connection, however, we note the Legislature's commendable modification of the formerly absolute rule of ineligibility, which now provides: ''In any case to which Section 6452 applies, the judge may request the district attorney to investigate the facts relevant to the advisability of commitment pursuant to this section. In unusual cases, wherein the interest of justice would best be served, the judge may, with the concurrence of the district attorney and defendant, order commitment notwithstanding Section 6452.'' (Pen. Code, §§ 6450 and 6451, as amended by Stats. 1963, ch. 1706, §§ 7 and 8.) The discretion thereby vested in the court and the district attorney ''should be exercised with a view to implementing, rather than possibly frustrating, the strong legislative policy disclosed by the enactments creating and governing the narcotic addict rehabilitation program.'' (*People* v. *Ortiz* (1964) 61 Cal.2d 249, 254-255 [3] [37 Cal. Rptr. 891, 391 P.2d 163].)

innocence when a criminal charge has been filed; and, when guilt is found, the subsequent suspension of proceedings and transfer of the case are necessary preliminary steps to instituting an inquiry into defendant's addictive status. But from and after that point in the proceedings, all persons being subjected to examination and hearing for possible civil commitment should receive the benefit of the same statutory safeguards. We held as much in *In re Jones* (1964) *supra,* 61 Cal.2d 325, 328-330 [4], where we noted that there is no express authorization in article 2 for waiver of hearing, whereas article 3 contains such a provision (Pen. Code. § 6507); reasoning that "the policy respecting waiver should be the same under either article," we in effect construed section 6507 to be applicable to both article 2 and article 3.

Such common treatment would further the declared remedial purpose of the subject legislation, i.e., that all persons addicted to narcotics or in imminent danger thereof "shall be treated for such condition and its underlying causes, and that such treatment shall be carried out for nonpunitive purposes not only for the protection of the addict, or person in imminent danger of addiction, against himself, but also for the prevention of contamination of others and the protection of the public." (Pen. Code, § 6399;[6] see also *In re De La O* (1963) *supra,* 59 Cal.2d 128, 148 [12]; *People* v. *Ortiz* (1964) *supra,* 61 Cal.2d 249, 255 [3].) To the extent that persons convicted of a crime are singled out by reason of the different method of handling their petitions for commitment set up by article 2, the statute can be viewed as creating further "external indicia of criminality" which, as we said in *In re De La O* (1963) *supra,* 59 Cal.2d 128, 149 [13], are "both unnecessary and unfortunate," and which run counter to the declared policy of treating all persons committed under this program "for nonpunitive purposes only" (Pen. Code, § 6399). Moreover, a sufficiently serious discrepancy between the procedural rights afforded under the two types of commitments could result in a denial of equal protection of the law. (Cf. *In re Trummer* (1964) 60 Cal.2d 658, 662-664 [4] [36 Cal.Rptr. 281, 388 P.2d 177].) On their face, the provisions of article 2 and article 3 show several

---

[6]Section 6399 (Stats. 1963, ch. 1706, § 1) was added after the commitment proceedings in this case were completed, but is rendered retroactively relevant by virtue of its closing declaration that "The enactment of the preceding provisions of this section shall not be construed to be evidence that the intent of the Legislature was otherwise before such enactment."

apparent divergencies.[7] In practice, however, these differences have been minimized by an indiscriminate borrowing of procedural devices one from the other, so that the actual processings of petitions for commitment under article 2 and article 3 tend toward an improvised, overall uniformity. But the price of such a makeshift solution has been frequent disregard of the statutory language and a consequent uncertainty as to the validity of a number of narcotic commitments.[8]

The present case offers another illustration of a situation arising in the operation of the statute for which no enabling provision has been made. Here the extent of defendant's addiction problem was apparently not recognized until after he had been convicted of a crime, sentence had been imposed

---

[7]Thus article 2 expressly provides that the person sought to be committed shall first be brought before a judge of the superior court and informed of ''his rights to make a defense to such charge and to produce witnesses in relation thereto'' (Welf. & Inst. Code, § 5353); article 3 contains no such provision, although due process of law would appear to require such notice. As noted above, article 2 also guarantees the attendance at the hearing of ''at least two medical examiners'' (Welf. & Inst. Code, § 5053); while article 3 allows the court to appoint only ''a physician or physicians'' (Pen. Code, § 6502), and nowhere commands that the court automatically compel their attendance. On the other hand, article 3 requires dismissal of the petition *before* the formal hearing if the medical report finds no addiction or imminent danger thereof (Pen. Code, § 6504); but article 2 contains no such authorization for early termination of the proceedings, apparently requiring that the medical report shall not be prepared and certified until *after* the witnesses have been heard at the hearing (Welf. & Inst. Code, § 5055; but see fn. 8, *post*, as to actual practice in this regard).

[8]In the case at bench, for example, separate certificates were filed by the two court-appointed medical examiners (Drs. Solis and Morozumi), each declaring in part that ''We, Dr. _____ and Dr. _____, Medical Examiners in the County of SAN JOAQUIN, duly appointed and certified as such, do hereby certify under our hands that we have jointly examined ALEX VICTOR, an alleged narcotics addict and *have attended* before a judge of said court at the hearing on the affidavit [i.e., petition for commitment] concerning said person, and *have heard* the testimony of all witnesses and, as a result of the examination, *have testified* under oath before the court to the following facts concerning said person: . . .'' (Italics added.) This recital appears to be patently incorrect. Both certificates were prepared and filed more than a month *before* the hearing therein referred to; furthermore, although Dr. Solis certifies that he ''ha[s] testified under oath before the court'' concerning his findings on defendant's addictive status, in fact he did not testify at the hearing and the People submitted the matter on these certificates and Dr. Morozumi's testimony alone. The trouble, of course, stems from the inept use in these proceedings of the inappropriately worded form prescribed for mental health examinations by Welfare and Institutions Code section 5055. That section, unfortunately, is incorporated by reference in article 2 commitment procedure (Pen. Code, §§ 6450 and 6451), and has often (as here) been borrowed for like service in article 3 cases as well. We pointed out its inappropriateness in *In re Raner* (1963) *supra*, 59 Cal.2d 635, 641, fn. 8, 642, fn. 9; but apparently the form has been continued in use without change in wording.

(and partially suspended), and he had begun to serve his probationary period of confinement in jail. As it now reads, section 6450 requires the judge of the criminal court to decide "upon conviction" (i.e., upon establishment of guilt by plea, verdict, or finding) whether the defendant should receive treatment for narcotic addiction or punishment for his crime, and that choice must be made *before* sentence is imposed.[9] The latter limitation is consonant with the purpose of the statute to provide essentially civil confinement for treatment of narcotic addicts, in that (1) it insures that no person shall begin such treatment while under the disabilities resulting from entry of a criminal judgment against him (see *People* v. *Banks* (1959) 53 Cal.2d 370, 384 [9] -386 [16] [1 Cal.Rptr. 669, 348 P.2d 102]), and (2) upon successful completion of treatment and discharge from the program, the absence of such a judgment will facilitate dismissal of the original criminal charges if the court should be so minded (see Pen. Code, § 6520).[10] But here the proceedings were neither "adjourned" in any sense of the term nor was the imposition (as distinguished from the execution) of the sentence "suspended." It follows from the face of the statute that after defendant had been sentenced, section 6450 was no longer available to support a commitment to the narcotic addict rehabilitation program.

 The Attorney General urges that it was nevertheless proper to commit defendant pursuant to article 3 (Pen. Code, §§ 6500-6510). The position is untenable. It is true that section 6500 does not in so many words *forbid* the filing of a petition for commitment in these circumstances; yet

[9] Section 6450 provides in relevant part: "*Upon conviction* of a defendant of any crime in a municipal or justice court, if it appears to the judge that the defendant may be addicted or by reason of repeated use of narcotics may be in imminent danger of becoming addicted to narcotics, such judge *shall adjourn the proceedings or suspend the imposition of the sentence* and certify the defendant to the superior court [for examination and hearing on the issue of the defendant's addictive status]." (Italics added.)

[10] In this regard the wording of section 6450 (and section 6451) is not as clear as it might be. Proceedings may be "adjourned" or suspended at several points in the trial process (see, e.g., Pen. Code, § 1050 [defendant's attorney called to session of Legislature], § 1053 [death or illness of judge], § 1142 [deliberations of jury], § 1191 [preparation of probation report], § 1193 [absence of defendant at time for pronouncement of felony judgment], § 1203.03 [confinement of defendant in diagnostic facility], and § 1368 [determination of defendant's sanity to stand trial]). In the present context, however, we assume for the reasons stated above that the Legislature did not intend that an inquiry under article 2 be instituted if the criminal proceedings were "adjourned" at any time *after* sentence had been imposed and judgment pronounced.

because the subject civil commitment procedure is entirely "a creature of statute" (*In re Raner* (1963) *supra*, 59 Cal. 2d 635, 639 [4]), there must be shown express *authority* to file such a petition. ▮ Not only is expression of that authority lacking, but the strong implication of the statutory scheme as a whole is that the Legislature did not intend to allow a commitment under section 6500 that in effect constitutes merely a delayed section 6450 proceeding. ▮ The commitment mechanisms provided in article 2 and article 3 must be deemed to be mutually exclusive: if the facts warrant proceeding under article 2— i.e., if the defendant has pleaded or been found guilty of a crime but sentence has not yet been imposed—the court must exercise its discretion under that article; it may not fail to do so and then remedy the oversight by belated recourse to the procedure sent up by article 3. Any other construction would obliterate for all purposes the distinctions drawn by the Legislature in enacting the separate commitment procedures of article 2 and article 3.

▮ It is not in any event for the courts to revise such a "creature of statute"; nor will they adjudicate its possible technical niceties of construction unless and until upon claimed impairment of the constitutional rights of a person subjected to its operation the issue is squarely presented.

▮ Moreover, as a practical matter the filing of a petition for narcotic commitment after the imposition of a penal sentence would be a futile act in every case where the defendant was actually serving such sentence at the time, for either (1) the narcotic commitment would have to stand by until the sentence was fully served or (2) the sentence would have to be interrupted or curtailed to allow the defendant to be transferred from prison to the Narcotic Rehabilitation Center. Neither alternative, however, is authorized by these statutes or by any other provision of law.[11]

▮ The Attorney General stresses that in the present case defendant was not actually serving a penal sentence at the time the subject petition was filed, but rather was con-

---

[11]It is no answer to say, as does the Attorney General, that the district attorney could simply await the defendant's release from custody under the criminal conviction before filing a petition pursuant to article 3. Whenever it may be filed, such a petition must relate to conduct sufficiently *recent* to support a bona fide belief that the person named therein is currently addicted or in imminent danger of addiction. If such a showing can still be made after the defendant's release from months or years in prison, the initiation of commitment proceedings under article 3 would apparently be proper; but it bears remembering that knowingly baseless petitions for commitment are prohibited (Pen. Code, § 6501).

fined in jail for a certain number of days as a condition of his probation. The stressed fact is true, but irrelevant. A judgment of imprisonment had nonetheless been pronounced and entered against defendant by the municipal court, and he was held in the custody of that court pursuant to its order of probation. Defendant was not released from that custody until May 14, 1963; accordingly, the superior court had no jurisdiction to order on April 5, 1963, that ''the Sheriff of the County of SAN JOAQUIN take, convey and deliver said person to the Director of Corrections at the Medical Facility at Vacaville, California for the execution of this order [of commitment].'' The Attorney General points out that the order of April 5 was subsequently stayed pending trial by jury on the issue of addiction; that defendant completed serving his period of probationary restraint and was released from jail on May 13; and that it was only on the latter date that, the jury having found adversely to defendant, he was in fact committed to the custody of the Director of Corrections for placement in the rehabilitation program.[12] There are two answers to this point. First, the superior court order of May 13 expressly relates back to that of April 5, declaring that defendant ''be remanded to the custody of the Sheriff to be by him delivered into the custody of the Director of Corrections in execution of the Order of the Court heretofore made on the 5th day of April, 1963.'' Second, although defendant may have been released from actual custody (i.e., from jail) on May 13, he remained in constructive custody of the municipal court until completion of his probationary period on the following day. ▉ If these computations seem excessively technical, that very fact emphasizes our conclusion that the Legislature cannot reasonably have intended an improperly filed petition for commitment under article 3 to be retroactively validated simply because the district attorney manages to time the order of commitment (or jury verdict of addiction) to coincide with the defendant's release from prior custody, whether actual or constructive.

Finally, the Attorney General contends that the construction here proposed will create a jurisdictional ''gap'' in the statutory scheme by denying treatment to those persons whose addition is ''discovered'' only after they have reached prison. But in the present state of the law, as noted above, this ''gap'' is already inherent in the absence of statutory au-

---

[12]The Attorney General does not contend that the conjunction of these two events on May 13 was anything more than sheer coincidence.

thorization to interrupt or curtail execution of a prison sentence for the purpose of transferring a convict to the Narcotic Rehabilitation Center. Instead, the Legislature has authorized treatment for narcotics addiction in city or county jails and the state prison system (Health & Saf. Code, § 11391, subds. (b) and (c)), and in particular at the California Medical Facility at Vacaville (Pen. Code, § 6102, subd. 4). The situation in any event does not appear to have serious implications for the future, for in view of the "strong legislative policy" which "favors inquiry into the addictive status of *all* criminal defendants whose record indicates the presence of an addiction problem" (*People* v. *Ortiz* (1964) *supra,* 61 Cal.2d 249, 255 [3]) few if any of such persons should hereafter fail to be detected at the presentencing stage.[13]

*Asserted Unconstitutionality of Committing Persons Who Are "in Imminent Danger of Becoming Addicted"*

Defendant makes a two-pronged attack on the constitutionality of involuntary commitment of persons who "by reason of the repeated use of narcotics are in imminent danger of becoming addicted to narcotics" (see Pen. Code, § 6500). He first contends that the subject language is unconstitutionally vague in that it assertedly provides no ascertainable standard for measuring the degree of addiction or imminency of addiction that will be sufficient to support a commitment to the rehabilitation program; secondly, defendant urges that even if this category could be adequately defined, the police

---

[13] A defendant who upon being found guilty is not incarcerated but is released on probation could, of course, become addicted (or in imminent danger thereof) *after* conviction, i.e., during his probationary period outside prison walls; in such event there would have been no opportunity to detect his condition at the presentencing stage. Here again is a situation for which no provision has been made in the subject legislation. Two alternatives appear under the law as it now reads, according to whether in granting probation the criminal court suspended (1) the imposition or (2) the execution of the sentence. If the court suspended (i.e., deferred) the imposition of sentence, it would seem that upon development of the probationer's addiction problem commitment proceedings could properly be instituted under article 2. Although the language of sections 6450 and 6451 may be read as implying that such proceedings are to be instituted, if at all, promptly "Upon conviction" of the defendant, that inference is not compelled. The real gap in the statutory scheme appears when the court imposes sentence but suspends its execution, and thereafter the probationer develops an addiction problem: in such case neither article 2 nor article 3 appears to be available, as they now read. Of course in many such instances the process of becoming addicted will involve conduct justifying revocation of probation, and the defendant can then be treated upon his return to custody; the conduct could also constitute an independent crime upon which criminal action could be instituted.

power of the State cannot constitutionally be extended to place in involuntary quarantine persons who are not actually afflicted with the "disease" of narcotics addiction but are only "in imminent danger" thereof. This is the first case to come before us which squarely presents both issues. In each of the previous commitment cases before this court (beginning with *In re De La O* (1963) *supra,* 59 Cal.2d 128, 134) the defendant was found to be an "addict" and was committed as such; here, by contrast, the reports and testimony of the examining physicians established unequivocally that defendant was not then and had never been "hooked" or addicted in the strict sense of the word, so much so that the question of whether defendant was an "addict" was not even submitted to the jury. Yet defendant was found to be "in imminent danger of becoming addicted" by the same examining physicians, by the committing court, and by the reviewing· jury, and was expressly committed to the California Rehabilitation Center on that basis. Thus the factual distinction between the two grounds of commitment could not be more clearly presented. Resolution of these issues, moreover, is a matter of substantial importance to the operation of the narcotic commitment program as a whole, for the subject language (or its variant, "in imminent danger of addiction") is used throughout the commitment provisions of this legislation (Pen. Code, §§ 6450, 6451, 6500, 6504, 6506), in the statutory declaration of intent (Pen. Code, § 6399), and in the sections creating the narcotic addict rehabilitation facility (Pen. Code, §§ 6400, 6551). In these circumstances we address ourselves to the issues raised by the challenged language.

*Asserted unconstitutional vagueness of the phrase "in imminent danger of becoming addicted."* This question was briefly touched on in *In re De La O* (1963) *supra,* 59 Cal.2d 128, 153 [16a-16b], where we observed (at p. 153 [17]) that "Words used in a statute are ordinarily to be construed according to the context and 'the approved usage of the language' (Civ. Code, § 13), and 'a statute is sufficiently certain if it employs words of long usage or with a common law meaning, "notwithstanding an element of degree in the definition as to which estimates might differ" ' [citation]." We adhere to those rules; but as the petitioner in *De La O* was found to be—and was committed as—an "addict" rather than one "in imminent danger of becoming addicted," we had no occasion in that case to define the latter phrase more fully. The occasion is now presented.

The words "imminent danger" are words of long usage, both in everyday speech and in the law. Reflecting common understanding, the dictionary defines "imminent" as "Ready to take place; near at hand; impending; hanging threateningly over one's head; menacingly near." (Webster's New Internat. Dict. (3rd ed. 1961), p. 1130.)[14] And in various contexts the courts have followed common usage and the lexicographers in construing the terms "imminent" or "in imminent danger" (see cases collected at 42 C.J.S., p. 394, fns. 19-27; 20 Words & Phrases, pp. 215-225); for example, in applying the "sudden peril" doctrine in the law of torts (see *Leo* v. *Dunham* (1953) 41 Cal.2d 712, 714 [1] [264 P.2d 1]) it is often held that to be "imminent" the danger must be " 'certain, immediate, and impending; it may not be remote, uncertain or contingent. A likelihood or bare possibility of injury is not sufficient to create imminent peril.' " (*Ornder* v. *Childers* (Mo. 1959) 327 S.W.2d 913, 916 [3].) These various shades of meaning all share a common element: i.e., the proximity of the event that is said to be "imminent."

Defendant recognizes that the foregoing represents the commonly understood meaning of this language, but argues that there are so many degrees of proximity that in any given case one cannot be certain of how close is "imminent." The argument, in the circumstances of the case at bench, is untenable. Admittedly the word is to some extent a relative one; but "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." (*Nash* v. *United States* (1913) 229 U.S. 373, 377 [33 S.Ct. 780, 57 L.Ed. 1232].) The language here in issue is, if anything, more restricted in scope than many other terms that have been upheld by our courts against a challenge that they were void for vagueness. (See, e.g., *Pacific Coast Dairy* v. *Police Court* (1932) 214 Cal. 668, 675 [8] - 678 [13] [8 P.2d 140, 80 A.L.R. 1217] ["diligent effort to find the owner"]; *People* v. *Associated Oil Co.* (1930) 211 Cal. 93, 107-108 [7] [294 P. 717] ["unreasonable waste of natural gas"]; *Ex parte Daniels* (1920) 183 Cal. 636, 646 [5] - 647 [6] [192 P. 442, 21 A.L.R. 1172] ["unsafe and unreasonable rate of speed"]; *People* v. *Curtiss* (1931) 116 Cal.App.Supp. 771, 778 [2] - 781 [5] [300 P. 801] ["unjustifiable physical pain or mental suffering"]; *People* v.

---

[14]In the case at bench the trial court instructed the jury on the meaning of "imminent" in precisely these terms.

*Crossan* (1927) 87 Cal.App. 5, 9-10 [2] [261 P. 531] [''due caution and circumspection'']; *People* v. *Smith* (1939) 36 Cal.App.2d Supp. 748, 751-752 [2] [92 P.2d 1039] [''a wilful or a wanton disregard'' for safety].) It follows, pursuant to the rules stated above, that the presence of an element of degree in the definition of ''imminent danger'' does not of itself render the statutory language insufficiently certain to comply with due process. '' 'Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.' [Citation.] It will be upheld if its terms may be made reasonably certain by reference to other definable sources.'' (*American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 218 [9] [28 Cal.Rptr. 700, 379 P.2d 4].)

A primary source of definition is the context of the questioned language (Civ. Code, § 13), i.e., ''imminent danger of *becoming addicted*.'' Little guidance is to be derived, unfortunately, from the various statutory definitions of the word ''addict'' that have been promulgated over the years (see, e.g., present Pen. Code, § 6407; present and former Welf. & Inst. Code, § 5350; former Health & Saf. Code, §§ 11009 and 11720; Stats. 1927, ch. 89, § 2, p. 150). Their changing content reflects an understandable hesitancy and experimentation on the part of the Legislature in defining what is primarily a medical concept, but it precludes us from distilling any consistent pattern of statutory expression.[15] Turning to the case law, in *In re De La O* (1963) *supra*, 59 Cal.2d 128, 153 [16a-16b], we analogized to the use of the word ''addicted'' in Vehicle Code section 23105 (''It is unlawful for any person who is addicted to the use . . . of narcotic drugs . . . to drive a vehicle upon any highway''), which word had been

---

[15]An apt illustration of this phenomenon is found in the legislative history of the definition of ''addict'' appearing in the present narcotic commitment statute (Pen. Code, § 6407). In its first form (Sen. Bill No. 81, as amended Mar. 17, 1961) the statute contained no definition of the word ''addict'' at all. In its second form (as amended April 19, 1961) the statute declared that '' 'Narcotic addict' as used in this chapter means any person who habitually uses to the extent of having lost the power of self-control any narcotic as defined in Division 10 of the Health and Safety Code, except marijuana.'' In its third form (as amended May 11, 1961) the ''loss of self-control'' qualification was deleted, and ''addict'' was defined as any person ''who habitually . . . uses'' any of the listed narcotics unlawfully. But in its final (and present) form, the ''habitual user'' definition is in turn deleted, and the matter has in effect been set at large by defining ''addict'' simply as any person ''who is addicted to the unlawful use of'' any listed narcotic.

held to mean simply "accustomed or habituated to the use" of narcotics (*People* v. *Kimbley* (1961) 189 Cal.App.2d 300, 307 [10] [11 Cal.Rptr. 519]). In *De La O*, however, we were not in fact concerned with the presently relevant category of persons "who by reason of repeated use of narcotics are in imminent danger of becoming addicted." ■■■ Yet if reasonably possible we must construe this legislation so as to harmonize its provisions and give force and effect to every phrase thereof. (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [2-3] [335 P.2d 672].) In common parlance one who is "accustomed or habituated to the use of" narcotics would tend to take them "usually" or "frequently" (see *In re Newbern* (1960) 53 Cal.2d 786, 794 [13-14] [3 Cal.Rptr. 364, 350 P.2d 116]). But if the word "addicted" is to be thus defined in the language of the narcotic commitment law now in issue, that language would purport to authorize commitment of those "who by reason of repeated use of narcotics are in imminent danger of using narcotics usually or frequently." Not only would such a construction verge on redundancy, it would also revive the spectre of unconstitutional vagueness (see *In re Newbern* (1960) *supra*, 53 Cal.2d 786, 792 [9] - 797 [16b]; *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 766 [1] - 772 [12c] [4 Cal.Rptr. 910]). Because we are bound to prefer a constitutional to an unconstitutional construction of an act of the Legislature (*County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 801 [4] [31 Cal.Rptr. 302, 382 P.2d 342]), it becomes appropriate to reconsider the definition of "addict" in the light of the particular statutory language now in issue.

■■■ In creating a distinct category of persons who "by reason of repeated use" of narcotics are in imminent danger of "becoming" addicted, the Legislature has in effect recognized the fundamental medical fact that narcotics addiction is not so much an event as a process. ■■■ Judicial recognition is likewise shown in *People* v. *Jaurequi* (1956) 142 Cal. App.2d 555, 561 [11] [298 P.2d 896], where it was said that "The court will take judicial notice of the fact that the inordinate use of a narcotic drug tends to create an irresistible craving and forms a habit for its continued use *until one becomes an addict*" (italics added). ■■■ Certainly mere sampling or experimentation does not make an addict; but it could be a step in the process. ■■■ Among the identifiable stages in this process may be listed the following: (1) intro-

duction to and initial experimentation with the drug; (2) "joy popping" or occasional use to satisfy personal gratification or social pressures; (3) increasingly frequent use coincident with development of a growing degree of *emotional dependence* on the drug; (4) bodily reaction to such use by development of increasing physical *tolerance*; (5) temporary cessation (whether voluntary or not) of use of the drug, resulting in manifestation of *physical dependence* in the form of withdrawal symptoms; (6) realization by the user of the fact that it was his failure to maintain his intake of the drug that caused the withdrawal distress; (7) continuing use of the drug thereafter for the conscious and primary purpose of forestalling or alleviating withdrawal distress; and (8) concomitant side-effects, such as the tendency towards lowering of the user's anxiety threshold so that normal (nonaddict) instances of nervousness or discomfort become misinterpreted as signs of an impending withdrawal experience and hence increase even further the user's recourse to and dependence on the drug. (See Proceedings of the Institute on the Problem of Narcotics Addiction (1962) pp. 61-72; Drug Addiction: Crime or Disease? (Joint Committee of the American Bar Association and the American Medical Association on Narcotic Drugs) (1961) pp. 35-45; Winick, *Narcotics Addiction and Its Treatment* (1957) 22 Law & Contemp. Prob. 9, 10-14; Clausen, *Social and Psychological Factors in Narcotics Addiction* (1957) 22 Law & Contemp. Prob. 34, 48-50; *The Narcotic Problem* (1954) 1 U.C.L.A. L. Rev. 405, 426-429.)

The emphasized terms should be further explained. While no single definition of "addiction" may be satisfactory for all purposes, there is general agreement that abuse of an addictive depressant drug (e.g., morphine, heroin, codeine, and other opium derivatives; at least certain of the morphine-like synthetic analgesics and the barbiturates and similar hypnotics) will tend to produce in the user the three characteristic mental and physical responses of the addiction process: i.e., emotional dependence, tolerance, and physical dependence. Much has been written about these phenomena, and it appears that much is yet to be learned before they are fully understood. For our present needs, however, it will be enough to mention the following salient features of each:

*Emotional dependence* appears to be the result of a complex interaction of such factors as (1) deficiency or inadequacy of the preaddicted personality of the user; (2) initial effectiveness of the drug in relieving the user's feelings of insecurity or anxiety, whatever their source; (3) assimilation

of the user into a drug-oriented group in which the conventional moral disapproval of narcotic abuse is rejected as "square," the pleasures of drug effects are overvalued, and rationalizations are provided to allay fears of becoming "hooked"; and (4) progressive substitution of drug intake for normal forms of adaptive behavior until the user comes to believe the drug is the one and only panacea for all his real or imagined ills. (See Drug Addiction: Crime or Disease? *op. cit. supra,* pp. 50-64; Clausen, *Social and Psychological Factors in Narcotics Addiction* (1957) 22 Law & Contemp. Prob. 34, 38-50.) These and other factors may of course be of varying importance in any given case, according to the individual's psychological makeup and his familial and social environment; but it is generally agreed that when the stage of full emotional dependence has been reached, the user lives in a state of overpowering need or compulsion to periodically experience the effects of the drug and hence that its continued use becomes the primary support of and motive for his existence.[16]

The remaining two elements of the addiction process have been adequately described as follows (Proceedings, White House Conference on Narcotic and Drug Abuse (1962), pp. 277-278):

"*Tolerance* is a fundamental survival mechanism which permits body cells to be exposed continuously to toxic substances without evoking possibly dangerous responses. This is manifested by the phenomenon that successive doses of the same amount of drug produce lesser effects and that, conversely, larger and larger doses are necessary to achieve the effects of the first dose.

"Following repeated use, brain and other tissues become resistant to morphine and, to a lesser extent, to alcohol, barbiturates, and other depressants. Equivalent doses no longer relieve pain as effectively, nor do they depress respiration or produce euphoric effects to the same degree. In order to reestablish the desired effects larger doses are required. But additional tolerance is acquired to the larger doses until, ultimately, amounts of the drug ordinarily capable of producing lethal respiratory failure cause only minimal effects. . . .

---

[16]In the case at bench the trial court approximated this aspect of the definition by instructing the jury that "the term 'addicted to the Use of Narcotic Drugs' means that one has so far indulged in the use of and engaged in the practice of using narcotics or narcotic drugs that he has become an habitual user of narcotic drugs to the point that the narcotic drug has created a craving or desire to continue to use the narcotic, and the continued use of the drug has become an important motive in the addict's existence."

". . . With repeated administration and increasing doses, the brain is exposed to the concentration of a drug necessary for development of maximum *physical dependence*.

"*Physical dependence,* a state of latent hyperexcitability, develops in the cells of the central nervous system of higher mammals following frequent and prolonged administration of morphinelike analgesics, alcohol, barbiturates, and other depressants. It becomes apparent in specific subjective and objective symptoms and signs—the *abstinence syndrome* or the *withdrawal illness*—upon abrupt termination of drug administration. . . .

"The type of physical dependence which occurs with morphine is a unique biological phenomenon and occurs only . . . [with] the morphinelike analgesics. A different picture of dependence occurs with alcohol and the barbiturates. Although the mechanisms are not fully understood, they undoubtedly involve a biochemical adaptation in the central nervous system. During the continued administration of the drug no overt signs of physical dependence are observed. The *abstinence syndrome,* which appears following cessation of drug administration, involves a resurgence of activity of the nervous system."[17]

▮ To recognize that addiction is more a process than an event is also to clarify the scope of the challenged category of persons "who by reason of repeated use of narcotics are in imminent danger of becoming addicted." On the one hand, an individual may not escape an inquiry into his addictive status merely by showing that he is not yet "hooked" in the strict sense of the word. On the other, to be brought within this category it is not enough that the individual be "addiction-prone," or associate with addicts, or even have begun to experiment with drugs; he must have subjected himself to "repeated use of narcotics."[18] ▮ Defendant's argument that "repeated use" can theoretically mean as few as twice

---

[17]It should be emphasized that the foregoing definition is over-inclusive with respect to certain addictive drugs of the "stimulant" class: e.g., although a form of tolerance may be developed to amphetamines, physical dependence, as such, is not thought to be acquired through abuse of such drugs and there may be no specific abstinence syndrome upon withdrawal; and abuse of cocaine is generally held to result neither in tolerance nor in physical dependence. (Proceedings, White House Conference on Narcotic and Drug Abuse (1962) pp. 285-290.) Accordingly, addiction to such drugs—which can be as severe as opiate addiction—should be defined in terms of emotional or psychological dependence only.

[18]The instructions in the case at bench were deficient in that the jury were not told of this factor of "repeated use."

is unreasonable when the phrase is seen in the context of the whole addiction process, for "At least several weeks of experience with a drug are usually necessary for the development of an addiction." (Winick, *Narcotics Addiction and Its Treatment* (1957) 22 Law & Contemp. Prob. 9, 13.) Nor is it enough that the individual have thus "repeatedly used" narcotics, or even be "accustomed or habituated" to their use, unless such repeated use or habituation has reached the point that he is in imminent danger—in the commonsense meaning of that phrase discussed above—of becoming emotionally or physically *dependent* on their use.

■ *Asserted lack of constitutional power to quarantine persons who are "in imminent danger" of addiction.* This corollary contention falls with the first, for the necessary power flows from the nature of the addiction process itself and the wording of the controlling statutes. As construed hereinabove, the legislation is not vulnerable to defendant's charge that it subjects to narcotic commitment proceedings individuals who simply suffer from "personality disturbances" or predisposition towards addiction. ■ The legislation does not reach such persons until by repeated *acts* of obtaining, preparing, and ingesting an addictive drug they demonstrate that they have failed to resolve their problems by socially acceptable methods and that total addiction is just a matter of time. When that stage is reached, the state has the right and duty to intervene for the protection of the individual in question and of society at large.

There is no novelty in such timely intervention to minimize at the imminent stage the personal and social damage which could only be more grievous with total addiction. In almost identical language Health and Safety Code section 11751 empowers the Adult Authority to retake a parolee and place him in a narcotic treatment-control unit when it has reasonable ground to believe that the parolee "is addicted to, or is in imminent danger of addiction to, narcotics" (see also Health & Saf. Code, §§ 11750, 11752, 11753). Similarly, the law relating to sexual psychopaths (now called "mentally disturbed sex offenders") authorizes post-conviction civil commitment proceedings if by reason of mental defect or disease the individual "is predisposed to the commission of" sexual offenses dangerous to others (Welf. & Inst. Code, §§ 5500 et seq.). Again, commitment is authorized under the different category of "mentally abnormal sex offenders" if the individual has evidenced a total lack of self-

control and hence "is likely to" commit sexual attacks (Welf. & Inst. Code, §§ 5600 et seq.). And commitment is authorized of a mentally defective or psychopathic minor who is an habitual delinquent "or has tendencies toward becoming an habitual delinquent" (Welf. & Inst. Code, §§ 7050 et seq.). The constitutionality of sexual psychopath laws, of course, has been upheld (*Minnesota* ex rel. *Pearson* v. *Probate Court* (1940) 309 U.S. 270, 274-276 [60 S.Ct. 523, 84 L.Ed. 744, 126 A.L.R. 530]), and no reason is shown to doubt the validity of the other cited statutes.

Finally, in delineating the subject category of persons amenable to civil commitment the Legislature has struck a reasonable balance between the interest in safeguarding the constitutional rights of the individual to be committed (when the statutory language is construed as indicated herein) and the interest in promoting the beneficial goals of this legislation, i.e., the care, treatment, and rehabilitation of narcotics addicts (see Pen. Code, § 6399; *In re De La O* (1963) *supra,* 59 Cal.2d 128, 148 [12]). Those goals are at best difficult to achieve in many cases, in view of the complex and imperfectly understood causes of this affliction; but the chances of success will be enhanced in any given instance if the rehabilitation process can be begun before the individual is "hooked" or totally dependent on the drug.

For these reasons it appears to be well within the Legislature's constitutional power to recognize and interrupt an established *addiction process*; i.e., to provide that when the danger to the individual and to society has become imminent the committing authorities need not sit idly by, but may move to institutionalize the affected person before the inevitable final scenes of the drama of addiction are played out.

Solely upon the ground that the superior court lacked jurisdiction to entertain proceedings under Penal Code sections 6500 to 6510 in the circumstances hereinabove related, the order of commitment must be and is reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.