[Civ. No. 27696. Second Dist., Div. Three. June 9, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. NORMAN MICHAEL DAVIS, Defendant and Appellant.

Brody, Grayson & Green and Joseph T. Vodnoy for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—Appellant having been convicted of a felony in the superior court, proceedings on the criminal charge were suspended and a petition for his commitment under Penal Code, section 6451, was filed. A hearing was held before a judge sitting without a jury and appellant was committed to the California Rehabilitation Center for a period of 10 years, except as his earlier discharge might be provided by law.

Before the hearing appellant had been examined by two doctors appointed by the court. At the very outset of the hearing a stipulation was entered into between counsel that a certificate signed by these doctors could be received into evidence. This was done. The court, also by stipulation, admitted into evidence a letter from one Maurice L. Daitch, M.D., portions of which are set forth in the footnote.[1]

After the certificate and the letter were introduced in evidence, one of the two doctors who signed the certificate, Doctor Tweed, was sworn and took the stand and was examined by both counsel and by the court. The other medical examiner, Doctor Peters, was present during the proceedings but did not testify formally. The only other witness was appellant. The court orally announced its finding immediately after appellant testified. There is nothing in the record to indicate that either Doctor Tweed or Doctor Peters at any time read Doctor Daitch's communication.

The hearing which resulted in appellant's commitment was held pursuant to Penal Code, section 6451. That section commanded then, as it does now, that "proceedings shall be

---

[1] "May 7, 1963 . . . I have known Norman Davis since he was nine years old. In that time he has appeared to be essentially a good boy, although there have always been some problems with him. As any of us know, who have taken care of young people, that sometimes they will experiment with the taking of drugs at some time or another. I have felt that at certain times he had experimented with various types in order to find out the effect it has had upon him.

"It is my impression that these episodes have been merely passing fancies and that now that he has been caught up with and he has served as many months as he has at present, he will no longer have any experimental inclinations.

"I have worked with a large number of addicts for a period of years and I find that the majority of them who are not experimenting are soon probably pretty well addicted to the use of drugs, but every so often I have found that one who plays around trying to get a "kick" but has not really latched on to any drug firmly enough to be addicted, can call it "quits" and leave it as such. I believe this is the case in relation to Norman Davis. . ."

conducted in substantial compliance with Sections 5353, 5053, 5054 and 5055 of the Welfare and Institutions Code.'' The certificate by Doctors Tweed and Peters which is on a printed form, was obviously drawn in an attempt to comply with the form set forth in Welfare and Institutions Code, section 5055. In particular it contains the recital that the medical examiners ''have attended before a judge of said court at the hearing on the affidavit (petition) concerning said person, and have heard the testimony of all witnesses and, as a result of the examination, have testified under oath before the court to the following facts concerning said (the alleged mentally ill) person:....''[2]

Sections 5053 and 5055 of the Welfare and Institutions Code contemplate that the medical examiners personally examine the patient, listen to the testimony of all witnesses, testify themselves and after hearing the testimony make and sign a certificate in which they are to make their recommendation for the disposition of the patient. The obvious purpose of the requirement of section 5055 that the certificate be made and signed at the end of the hearing is to give the medical examiners an opportunity to base their recommendation not only on facts observed by them and opinions reached by them before the hearing, but on all of the evidence adduced. This is an eminently sound policy, particularly in view of the limited time usually available to the medical examiners for their own examination.

Unfortunately this was not done here. The two doctors apparently came to the hearing armed with the signed certificate which was placed in evidence right at the beginning, before appellant had taken the stand and before the letter from Doctor Daitch was received.[3] As far as the record shows

---

[2]The words appearing in parenthesis are those prescribed in Welfare and Institutions Code, section 5055 and are not in the certificate used in the instant case.

[3]Similar discrepancies between the contents of the certificates of the medical examiners and the actual proceedings were noted with disapproval by the Supreme Court in *People* v. *Victor*, 62 Cal.2d 280, 293, footnote 8 [42 Cal.Rptr. 199, 398 P.2d 391]. The difficulty there, as here, stems from a dilemma caused by the legislative mandate to proceed in substantial compliance with certain sections of the Welfare and Institutions Code, coupled with the rule that the commitment procedure must be conducted in strict compliance with the specific statutory prerequisites for the maintenance of the proceeding. (*In re Raner*, 59 Cal.2d 635, 639 [30 Cal.Rptr. 814, 381 P.2d 638]; *People* v. *Victor, supra*, at p. 291.) This type of legislation by reference to a procedure originally devised for a different purpose was criticized in *People* v. *Victor, supra*, at pp. 289-293.

neither Doctor Tweed nor Doctor Peters ever knew the contents of Doctor Daitchs' communication.[4]

We cannot stop to consider whether there is a probability or a possibility that the medical examiners would have made a different recommendation at the end of the proceeding had they been asked to do so. ▮ Proceedings under Penal Code, article 2, chapter 11, title 7 of part III are statutory in nature. "Being a creature of statute, jurisdiction to enter an order of commitment pursuant thereto depends on *strict* compliance with each of the specific statutory prerequisites for maintenance of the proceeding." (*In re Raner,* 59 Cal.2d 635, 639 [30 Cal.Rptr. 814, 381 P.2d 638]; see also *In re Johnson,* 59 Cal.2d 644, 645 [30 Cal.Rptr. 819, 381 P.2d 643]; *In re Pizzo,* 221 Cal.App.2d 597 [34 Cal.Rptr. 576].)

In *Raner* a writ of habeas corpus was granted and the petitioner ordered discharged from custody because of the following violation of the procedure prescribed by the statute: the proceedings against him were started by the filing of a petition on July 11, 1962. A warrant of apprehension was issued on the same day. This warrant of apprehension was served on him on July 13 on which day he was also booked at the Los Angeles County Jail. He remained in custody until his hearing on July 19. There was thus a period of six days between his apprehension and the hearing. No affidavit of a physician had accompanied the petition for commitment as demanded by Penal Code, section 6502,[5] which would have enabled the court to order the confinement of Raner. His confinement pending the hearing was therefore illegal. The Supreme Court held inapplicable the rule that the lawfulness of the arrest has no bearing on the merits of a charge against a defendant and does not preclude prosecution, (cf. *People* v. *Valenti,* 49 Cal.2d 199, 203 [316 P.2d 633]) except of course to the extent that it may affect the admissibility of evidence at the trial; nor did it matter that during the illegal deten-

---

[4]Doctor Daitch, of course, was not a witness in the strict sense of the word, but both counsel stipulated that his letter be received in evidence, thereby waiving any incompetency due to lack of authentication or the hearsay rule. The People surely cannot stipulate that evidence may be received in an informal manner and then claim that it was not the type of evidence which the medical examiners had to take into consideration before filing their certificate pursuant to section 5055.

[5]The proceeding in *Raner* was under article 3 of chapter 11, while the instant proceeding is under article 2. The same principles apply. (*People* v. *Victor,* 62 Cal.2d 280, 295 [42 Cal.Rptr. 199, 398 P.2d 391].) There were several violations in *Raner,* but it is clear that the one described was sufficient to compel the result.

tion Raner had made no involuntary statements to doctors which might be a "necessary product of the illegal detention." His discharge was ordered simply on the ground that the trial court lacked jurisdiction to proceed because there had been no compliance with the specific statutory prerequisites for the proceeding.

Whatever leeway the court may have had because of the vague directive of Penal Code, section 6451 to proceed "substantially" in compliance with the sections of the Welfare and Institutions Code there enumerated, we cannot say that the failure of the two medical examiners to make their recommendation on the basis of all the evidence is substantial compliance, particularly in view of the evidence on which the court's finding was based.

We do not have to decide, as earnestly urged by appellant, that there is no substantial evidence to support the finding that by reason of repeated use of narcotics he may be in imminent danger of becoming addicted to narcotics, but we will say that the evidence is very close to the line. In evaluating the testimony before the court we must be guided by the law enunciated by the Supreme Court in *People* v. *Victor*, 62 Cal.2d 280 [42 Cal.Rptr. 199, 398 P.2d 391]. There the power of the state to commit a person because he is in imminent danger of becoming addicted to narcotics was challenged on two grounds: 1. That the language of the section provides no ascertainable standard for measuring the degree of addiction or imminency of addiction; and 2. That the state cannot constitutionally confine persons who are not yet addicted.

The Supreme Court held the phrase "imminent danger" to be sufficiently certain to withstand the attack. The court carefully traced the medically known steps in the process by which a person becomes an addict, showing that, except in the case of certain drugs not here relevant, addiction as such is not reached until the patient displays three symptoms: 1. Emotional dependence on the drug; 2. An increased physical tolerance; and 3. Physical dependence manifested by withdrawal symptoms on termination of intake. (See also *People* v. *O'Neil*, 62 Cal.2d 748 [44 Cal.Rptr. 320, 401 P.2d 928].) The process starts with initial experimentation and occasional use to satisfy personal gratifications; this is followed by increasingly frequent use coincident with development of a growing degree of emotional dependence, an increased physical tolerance and physical depend-

ence. In this gradual process there is a point, after repeated use and perhaps even after habituation, but before actual addition, when the individual is in imminent danger of becoming an addict. ▮▮ The following language from *Victor* is most significant: "To recognize that addiction is more a process than an event is also to clarify the scope of the challenged category of persons 'who by reason of repeated use of narcotics are in imminent danger of becoming addicted.' On the one hand, an individual may not escape an inquiry into his addictive status merely by showing that he is not yet 'hooked' in the strict sense of the word. On the other, to be brought within this category it is not enough that the individual be 'addiction-prone,' or associate with addicts, or even have begun to experiment with drugs; he must have subjected himself to 'repeated use of narcotics.' Defendant's argument that 'repeated use' can theoretically mean as few as twice is unreasonable when the phrase is seen in the context of the whole addiction process, for 'At least several weeks of experience with a drug are usually necessary for the development of an addiction.' (Winick, *Narcotics Addiction and Its Treatment* (1957) 22 Law & Contemp. Prob. 9, 13.) ▮▮ Nor is it enough that the individual have thus 'repeatedly used' narcotics, or even be 'accustomed or habituated' to their use, unless such repeated use or habituation has reached the point that he is in imminent danger—in the commonsense meaning of that phrase discussed above—of becoming emotionally or physically *dependent* on their use." *Ibid.* pp. 304-305 (62 Cal.2d).

The court also holds that the power of the Legislature to confine before total addiction has been reached, begins when persons "by repeate*d* *acts* of obtaining, preparing, and ingesting an addictive drug" have demonstrated "that they have failed to resolve their problems by socially acceptable methods and that total addiction is just a matter of time. When that stage is reached, the state has the right and duty to intervene for the protection of the individual in question and of society at large." *Ibid.* p. 305.

▮▮ The events in the instant proceedings must therefore be considered in the light of the constitutional lack of power of the state to confine for mere experimentation, "joy popping," occasional use to satisfy personal gratification or social pressures or even habituation, unless such habitual use has reached the point of imminent danger of emotional or physical

dependence. The record before us is rather scant. Admittedly some of the gaps exist only because of a failure of appellant's counsel to insist that they be filled, perhaps for good reason.

 Doctor Tweed testified that he came to his conclusion that appellant was in imminent danger of becoming addicted because appellant told him that he tried marijuana a few years ago and heroin once. An examination of appellant's nostrils showed an absence of hair follicles, unusual in a man of his age. He was also of the opinion that appellant must have sniffed heroin more than once, because if the hair had been removed by a single intake appellant would have been unconscious or wound up "some place in a hospital." Further, the heroin in question would have to be, "real strong stuff" but the drug usually sold "around here" was not strong enough to destroy the hair in one single whiff.[6] There is nothing in the record to show Doctor Tweed's professional qualifications to come to the conclusion that on these facts appellant was in imminent danger of addiction. We note that the evidence on which his opinion is based seems to come strictly within the language of *People* v. *Victor, supra,* to the effect that mere experimentation with drugs, repeated use or even possibly habituation are insufficient proof. We assume, without deciding, that proof of repeated use coupled with expert testimony showing why in the case of a particular patient the repeated use is sufficient to create an imminent danger of addiction, is enough to make a prima facie case. The doctor's expertise appears to have been conceded, but granted the expertise it should be obvious that had Doctor Tweed read the report of Doctor Daitch he might well have changed his conclusion. The letter reveals experience in the field of addiction, a willingness to concede that in some cases experimenting leads to addiction, acquaintance with appellant for many years and the opinion that in his case the experimenting was just that and nothing more. Whether or not the letter would have affected Doctor Tweed's conclusion, the plain letter of the law required him to take it into consideration and this he did not do.

---

[6]It appears to have been everybody's thought at the trial that because Penal Code, section 6451 speaks of "repeated use of narcotics" and section 6407 defines a narcotic addict as a "person . . . who is addicted to the unlawful use of any narcotic . . . except marijuana" the People have to prove, in effect, a "repeated use of narcotics other than marijuana" to comply with section 6451. This does not necessarily follow legally, though it may be sound medically. We do not decide the point.

Appellant himself took the stand. Whether or not he aided his cause is doubtful. He testified that he had sniffed heroin only once and that it had made him nauseous and dizzy. He had never taken heroin in any other manner, had tried marijuana before that particular experience and possibly three times since.

That was all the evidence. Doctor Peters never testified formally. He was present and answered a couple of questions from the court without having been sworn. He said nothing about Doctor Daitch's letter.

Under these circumstances it is clear to us that the failure to comply with the statutory procedure demands a reversal.[7]

The order is reversed.

Shinn, P. J., and Ford, J., concurred.

---

[7]Since the hearing in the instant matter the Supreme Court decided *In re Trummer,* 60 Cal.2d 658 [30 Cal.Rptr. 281, 388 P.2d 177]. If the People elect to attempt to commit appellant again, he is entitled, if dissatisfied with the order of the court, to a trial ''by a judge or jury in substantial compliance with the provisions of section 5125 of the Welfare and Institutions Code.''