[L.A. No. 29776. In Bank. Dec. 21, 1970.]

SID MANNHEIM, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE STATE OF CALIFORNIA, Real Party in Interest.

COUNSEL

Sid Mannheim, in pro. per., for Petitioner.

Edward J. Boessenecker and Howard R. Benson as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Thomas C. Lynch, Evelle J. Younger, Attorneys General, and Ariel C. Hilton, Deputy Attorney General, for Real Party in Interest.

OPINION

SULLIVAN, J.—Petitioner Sid Mannheim seeks a writ of mandate to compel the probate court to enter a supplemental order distributing to his clients[1] the unallocated portion of the estate of Janet Nieto, pursuant to section 228, as amended, of the Probate Code.[2]

Janet Nieto died intestate in Los Angeles on March 19, 1968. Her estate is being administered by the public administrator. In December 1968 petitioner as attorney for the five heirs of decedent's predeceased husband filed a petition to determine heirship. In response to this petition, the probate court on May 29, 1969, entered its decree determining heirship (§ 1192) providing in substance as follows: (1) decedent left no surviving spouse, issue or descendants of issue;[3] (2) the entire estate consisted of property formerly held in joint tenancy by Mrs. Nieto and her husband; (3) petitioner's clients, the heirs of Mrs. Nieto's predeceased husband, were entitled to one-half of the estate.[4] No allocation was made of the remaining one-half, and that portion is the subject of the present litigation.

At the date of Mrs. Nieto's death and at the date of the above decree,

---

[1] It is inappropriate for an attorney to appear as petitioner in a mandamus proceeding. Nevertheless, we have decided to consider the petition since there is no objection from petitioner's clients or from the real party in interest.

[2] Hereafter, unless otherwise indicated, all section references are to the Probate Code.

[3] The order did not state whether Mrs. Nieto left other heirs, but from the terms of the decree of distribution, we assume that no heirs of Mrs. Nieto are known.

[4] The court did not explicitly state whether the property was originally community property, governed by section 228, or separate property, governed by section 229. However, it is apparent from its disposition of one-half of the property that the decree is predicated on section 228.

section 228 provided that if the decedent left neither spouse nor issue, and the estate contained community property of decedent and a predeceased spouse, such property should go to the children of the predeceased spouse and their descendants, and if none, then one-half of the property should be distributed to specified heirs of the decedent and the other half to specified heirs of the predeceased spouse.[5] Section 230 provides that if there is no one to succeed to any of the above property, it descends to the "next of kin of the decedent."[6] If the decedent leaves no one to take any portion of the estate under the above statute, section 231 provides that the unclaimed property escheats to the state. ▆ Thus, since Mrs. Nieto left no known heirs, under then-existing law one-half of her estate was properly distributed to the heirs of her predeceased husband, and the remaining half should have been distributed to the State of California under section 1027, to be held for five years, during which it could be claimed by the "unknown heirs" of the decedent. If none appeared, it would then permanently escheat to the state at the end of that period. (Prob. Code, § 1027; Code Civ. Proc., § 1441.)

However, in 1969, over a year after Mrs. Nieto's death, section 228 was amended (Stats. 1969, ch. 856, § 1, effective November 10, 1969) to add thereto the following paragraph here in controversy: "If any of the property subject to the provisions of this section would otherwise escheat to this state because there is no relative, including next of kin of the decedent or of his predeceased spouse, such property shall be distributed in accordance with the provisions of paragraph 2 of section 296.4 of this code."

Section 296.4 is part of the Uniform Simultaneous Death Act; paragraph 2, which was added in 1968, provides: "If a portion of the estate which was the community property of the husband and wife should other-

---

[5]Section 228, as it then read, provided in pertinent part: "If the decedent leaves neither spouse nor issue, and the estate, or any portion thereof was community property of the decedent and a previously deceased spouse, and . . . became vested in the decedent on the death of such spouse by right of survivorship . . . in a joint tenancy between such spouse and the decedent . . . such property goes in equal shares to the children of the deceased spouse and their descendants by right of representation, and if none, then one-half of such community property goes to the parents of the decedent in equal shares, or if either is dead to the survivor, or if both are dead in equal shares to the brothers and sisters of the decedent and their descendants by right of representation, and the other half goes to the parents of the deceased spouse in equal shares, or if either is dead to the survivor, or if both are dead, in equal shares to the brothers and sisters of said deceased spouse and to their descendants by right of representation."

[6]The heirs of decedent's predeceased spouse are not "next of kin of the decedent" under section 230. (*State of California* v. *Broderson* (1967) 247 Cal.App.2d 797, 802 [56 Cal.Rptr. 58]; *Estate of Roberts* (1948) 85 Cal.App.2d 609, 613-617 [194 P.2d 28].)

wise escheat to the state under this section and Sections 201, 228 and 231 because there is no relative, including next of kin, of one of the spouses to succeed to such portion of the estate, such portion . . . shall be distributed in equal shares to the children of the other spouse and to their descendants by right of representation, or if such spouse leaves no children, nor descendants of a deceased child, in equal shares to the parents of such other spouse . . . or if both are dead, in equal shares to the brothers and sisters of such other spouse and to their descendants by right of representation, or if such other spouse leaves neither parent, brother, sister, nor descendant of a predeceased brother or sister, such portion of the estate goes to the next of kin of such other spouse. . . ."

The effect of the amendment is to prevent the escheat of any community property of a husband and wife who die simultaneously if either leave any heirs. By incorporating that distribution scheme into section 228, the Legislature provided the same treatment for community property of spouses who die at different times.

In December 1969, one month after the amendment to section 228 became effective, petitioner filed in the probate proceedings a "Motion for Order Supplementing Prior Decree Determining Entitlement to Distribution of Estate." He sought an order (1) that no portion of the estate escheat to the state and (2) that the remaining one-half of the estate be distributed to his clients. The motion was denied, as was a subsequent motion for reconsideration. Petitioner then sought a writ of mandate in the Court of Appeal to compel the trial court to enter the order previously refused. The Court of Appeal granted the alternative writ, but denied the peremptory writ, and we granted the petition for hearing.

We must first decide whether mandate is the appropriate remedy in this case. A writ of mandate "may be issued . . . to compel the performance of an act which the law specially enjoins, . . ." (Code Civ. Proc., § 1085.) The writ must be issued where no "plain, speedy, and adequate remedy" is otherwise available. (Code Civ. Proc., § 1086.) "It is well settled that *mandamus* will not lie to control the discretion of a court or judicial officer or to compel its exercise in a particular manner, except in those rare instances when under the facts it can be legally exercised in but one way [citations]." (*Hilmer* v. *Superior Court* (1934) 220 Cal. 71, 73 [29 P.2d 175].) (See *Lissner* v. *Superior Court* (1944) 23 Cal.2d 711, 715 [146 P.2d 232]; *Bales* v. *Superior Court* (1942) 21 Cal.2d 17, 25 [129 P.2d 685].) Here there is no dispute concerning the facts. The only issue is whether, as a matter of law, the provisions of section 228, as amended, control the right of succession to Mrs. Nieto's estate. If they do, the probate court is under a legal duty to apply them, and it may be

directed to perform that duty by writ of mandate. The absence of another adequate remedy was determined by the Court of Appeal when it granted the alternative writ.[7] (*County of Sacramento* v. *Hickman* (1967) 66 Cal. 2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]; *Erlich* v. *Superior Court* (1965) 63 Cal.2d 551, 557 [47 Cal.Rptr. 473, 407 P.2d 649]; *Weber* v. *Superior Court* (1960) 53 Cal.2d 403, 406 [2 Cal.Rptr. 9, 348 P.2d 572].)

We turn to the merits. Although the parties appear to assume that section 228, as amended, should be applied retroactively, we deem it necessary at the outset to dispose of that issue.

As has been mentioned, the amendment to section 228 incorporated by reference the distribution scheme of section 296.4. The act which amended section 296.4 expressly provided that the new provisions of that section "shall apply to any portion of an estate which on the effective date of this act has not vested absolutely in the state or has not permanently escheated to the state, whether the decedent died before or after such date." (Stats. 1968, ch. 1407, § 4.) ■ Accordingly, we are satisfied that the Legislature intended a retroactive application of section 296.4. The question which now confronts us is whether, in adopting the succession scheme of section 296.4 as a part of section 228, the Legislature meant to incorporate its retroactivity provision, as well.

We have been unable to find any legislative history bearing directly on this point. Therefore, we must turn to canons of statutory construction to aid us in the task of interpretation. ■ One such rule of construction counsels that "statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent." (*Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393 [182 P.2d 159]; see *Tevis* v. *City & County of San Francisco* (1954) 43 Cal. 2d 190, 195 [272 P.2d 757]; see also, Civ. Code, § § 3, 6; Code Civ. Proc., § 8.) Yet that canon expressly subordinates its effect to the most fundamental rule of construction, namely that a statute must be interpreted so as to effectuate legislative intent. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *Select Base Materials* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) The supremacy of legislative intent over the rule of prospectivity has recently been reiterated in *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948], where this court said of the pre-

---

[7]However, the probate court's order denying petitioner's motion for a supplemental order of distribution probably did constitute a refusal to make an order determining heirship, and was thus appealable under section 1240. (*Attorney General* v. *Superior Court* (1953) 41 Cal.2d 249, 251 [259 P.2d 1].)

sumption of prospectivity: "That rule of construction, however, is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent." (63 Cal.2d at p. 746.)

When the Legislature amended section 228, it expressly fashioned its revision in reference to the provisions of section 296.4. It goes without saying, therefore, that it must have been fully aware of the latter section and that it must be deemed to have been conscious of the statutory provision for its retroactive application. In the absence of any indication to the contrary, we infer that the Legislature intended to make section 228, as amended, operate in the same way as section 296.4. ■ We hold, therefore, that the amendment to section 228 is applicable to any estate which on the effective date of the amendment, November 10, 1969, "has not vested absolutely in the state or has not permanently escheated to the state" (Stats. 1968, ch. 1407, § 4), regardless of when the decedent died.

This conclusion is fortified by another rule of statutory interpretation— "that statutes relating to the same subject matter are to be construed together and harmonized if possible [citations]." (*County of Placer* v. *Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 188-189 [323 P.2d 753].) ■ In the case at bench, the policy which apparently motivated the Legislature to make section 296.4 retroactive—the avoidance of escheats wherever possible—is fully applicable to section 228. No reason appears to distinguish between the *simultaneous* death situation treated in section 296.4 and the *successive* death situation of section 228. As was said in *Gartner* v. *Roth* (1945) 26 Cal.2d 184, 189-190 [157 P.2d 361], in which retroactive application was given a statute allowing delinquent taxpayers to redeem property deeded to the state for nonpayment of taxes: "it would be unreasonable to assume that the Legislature, in granting in 1943 general relief to taxpayers whose lands had been deeded to the state . . . intended a different treatment for those taxpayers whose lands had been deeded between June 1, 1942 and August 4, 1943 . . . so that particular group should be denied the rights and privileges of redemption enjoyed by all the others whose property was tax-deeded to the state either prior or subsequent to that period. In according retroactive force to the 1943 act, such discrimination is avoided. . . ."

Having concluded that the amendment to section 228 is to be applied retroactively to estates, like Mrs. Nieto's, where no permanent escheat has

occurred, we proceed to consider whether such an application would result in a gift of public funds in violation of article XIII, section 25 of the California Constitution. It is the position of the Attorney General that the state acquired a vested interest in the unclaimed one-half of the Nieto estate as of the date of Mrs. Nieto's death and that such interest would be divested by petitioner's clients if section 228 were applied retroactively. The relinquishment of this right, he argues, when not made for a public purpose, constitutes an unconstitutional gift of public funds.

We have decided that the contention of the Attorney General is based on an erroneous assessment of the nature of the state's interest in Mrs. Nieto's estate. ■ Consequently we hold that section 228, applied retroactively in the instant case, does not constitute a gift of public funds because the state lacks any present interest in the property which would bring the constitutional prohibition into play.

An explanation of this conclusion requires a detailed analysis of the relevant statutes and case law. The Attorney General relies on section 231, which at the date of Mrs. Nieto's death provided,[8] in pertinent part: "If the decedent leaves no one to take his estate or any portion thereof . . . the same escheats to the State as of the date of the death of the decedent." Despite the language of this section, however, it has been uniformly held by the courts of this state that a judicial proceeding of some sort is a necessary precondition to an escheat. Thus in the landmark case of *State* v. *Savings Union Bank & Trust Co.* (1921) 186 Cal. 294 [199 P. 26], this court was called upon to interpret a statute which provided that bank accounts left untouched for 20 years "shall . . . escheat to the state," and which required the Attorney General to bring an action to obtain a judgment "declaring that said moneys have escheated to the state." (*Id.* at pp. 296-297.) The Attorney General argued that the phrase "shall . . . escheat to the state" accomplished an instantaneous escheat, and that the only purpose of the judicial proceeding was to obtain an adjudication that the escheat had already occurred and an order that the money be transferred to the state treasury. In rejecting that interpretation, this court declared that "our decisions held that some judicial procedure is necessary to perfect the escheat. 'By the civil law as well as the common law, the king cannot take upon himself the possession of an estate said to have escheated, until the fact is judicially ascertained by a proceeding . . . .' (*People* v. *Folsom,* 5 Cal. 379.)

---

[8]Section 231 was subsequently amended, but the change in language, from "at the date of death of the decedent" to "at the time of death" was apparently not intended to alter the meaning. (See 8 Cal. Law Revision Com. Rep. (1968) 1067, which was adopted by the Senate Committee on Judiciary as an expression of intent. 1 Senate Daily Journal (1968) 595.)

. . . There is some conflict of authority on this question, some states holding to the doctrine that title to an escheat vests immediately in the state upon the happening of the act which causes it (4 Kent, 424) but in this state . . . the other doctrine is followed." (186 Cal. at p. 299.)

In *Estate of Miner* (1904) 143 Cal. 194 [76 P. 968], we rejected a similar contention of the Attorney General based on former Civil Code section 1386, subdivision 9, the precursor to the present Probate Code section 231, which provided, "If . . . there be no heirs to take his estate or any portion thereof . . . the same escheats to the state. . . ." Construing a number of code sections, including section 1386, this court concluded that: "it seems very clear that in every case of a failure of succession for want of heirs or kindred of the decedent an action of escheat becomes necessary to vest the title in the state . . . ." (143 Cal. at p. 199.)

The conclusion that a judicial proceeding is required to accomplish an escheat is supported by provisions of the Code of Civil Procedure and the Probate Code. Section 1420 et seq. of the Code of Civil Procedure requires the Attorney General to commence a proceeding to obtain a judgment that the state is entitled to unclaimed property by reason of an escheat. Section 1027 of the Probate Code provides that if there are no known takers for a decedent's estate at the time of the filing of the final account by the executor or administrator, the court must distribute it to the State of California. It is this decree of distribution which vests a property interest in the state for the first time.

In the present case, since the probate court has not yet made any order of distribution to the state under section 1027 covering the unallocated portion of Mrs. Nieto's estate, no quantum of interest ever vested in the state. Even if such an order had been made, however, it is clear that the state would have obtained only a conditional or provisional interest. Section 1027 provides, "[i]f the court distributes the estate or any portion thereof to the State of California, and the distributing clause contains words otherwise creating a trust in favor of certain unknown or unidentified persons as a class, such distribution shall vest in the State of California both legal and equitable title to the property so distributed; saving, however, the right of claimants to appear and claim the estate or any portion thereof . . . ."[9] The section goes on to permit "unknown heirs" of the decedent to claim within five years from the date of distribution the property so distributed to the state. In *Estate of Lindquist* (1944) 25 Cal.2d 697 [154 P.2d 879], cert. den. 325 U.S. 869 [89 L.Ed. 1988, 65 S.Ct. 1408, 1410], the state's interest during the five-year period was described as follows: "It thus appears that title to property distributed to the state pursuant to the provisions of section 1027 does not

---

[9] A similar provision appears in section 1424 of the Code of Civil Procedure.

vest absolutely and unconditionally in the state, nor is the escheat complete, until the lapse of the five-year period without the appearance of claimants; theretofore the title held by the state is conditional and subject to divestment by the appearance of legitimate claimants." (*Id.* at p. 711.)

The tentative nature of the state's interest during this period distinguishes this situation from those decisions cited by the Attorney General involving the retroactive release of tax claims, in which the state's rights to the sums in question was absolute, matured, and unconditional. In the leading case of *Estate of Stanford* (1899) 126 Cal. 112 [54 P. 259, 58 P. 462], for example, the Legislature amended an inheritance tax statute to provide for immunity for certain classes of beneficiaries. The amendment was made retroactive to cover estates of decedents who had died within the past four years. Since the act imposing an inheritance tax provided that the tax became "due and payable at the death of the decedent," the court found that the state had a "present, fixed right" to the tax from the date of death which could not constitutionally be relinquished. (*Id.* at p. 119.) (See also *Estate of Martin* (1908) 153 Cal. 225 [94 P. 1053]; *Trippet* v. *State* (1906) 149 Cal. 521 [86 P. 1084].) By contrast, in *Allen* v. *Franchise Tax Board* (1952) 39 Cal.2d 109 [245 P.2d 297], we held that the state's right to income taxes did not vest until the tax was due and payable on April 15th following the close of the preceding calendar year, rather than at the end of such tax year. "True the plaintiff cannot escape liability for the tax on income earned in 1940. The amount of income may be determinable at the close of the year. But that fact does not control the time when the state's right to the tax becomes vested." (*Id.* at p. 114.) Consequently, the Legislature could validly alter the amount of taxes due if it acted before that date.

■ We think the principle announced in *Allen* controls here. Although the possibility of escheat may arise at the death of the decedent without heirs, the state's interest does not truly vest until the end of five years from the date of distribution. Until then, the state's interest is "conditional" or "provisional" and the state official (State Controller or State Treasurer) receiving the property distributed pursuant to section 1027 is a mere stakeholder for possible claimants. This conclusion was recognized in *Lindquist* as to unknown heirs of the decedent. ■ Section 228, as amended, simply enlarges the class of possible claimants to include specified heirs of the predeceased spouse. Such an increase does not result in a gift of public funds for the simple reason that the state cannot give away what it does not yet own. Only after the passage of five years, when no claimants have come forward, does the state acquire a significant interest in an estate.

■ Finally, it is well established that a relinquishment of rights by the state—if made for a public purpose—will not violate the constitutional pro-

hibition. The concept of public purpose has been liberally construed by the courts, and the Legislature's determination will be upheld unless it is totally arbitrary. (*County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]; *Central Basin etc. Wat. Dist.* v. *Fossette* (1965) 235 Cal.App.2d 689, 702 [45 Cal.Rptr. 651].) The fact that individuals may be incidentally benefited is irrelevant.

In *California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210 [187 P.2d 702], for example, we upheld a statute which retroactively cut off the state's right to sue employers for delinquent unemployment insurance contributions on the ground that there was a public benefit in having enforcement officers devote their time to fresh, rather than stale, claims. In *Gartner* v. *Roth, supra,* 26 Cal.2d 184, the retroactive application of a statute permitting redemption of tax-deeded property was held not to constitute a gift of public funds, in part because the return of property to the tax rolls was considered a legitimate public purpose. And in *County of Alameda* v. *Janssen, supra,* 16 Cal.2d 276, no constitutional infirmity was found in a statute which released preexisting public liens on the property of indigents receiving public assistance.

In the present case the Legislature has determined that escheats are to be avoided wherever possible. Such a conclusion cannot be considered arbitrary, for the courts have long held that escheats are not favored by the law. (*Estate of Spinosa* (1953) 117 Cal.App.2d 364, 372 [255 P.2d 843]; *People* v. *Stockton Sav. & Loan Soc.* (1901) 133 Cal. 611, 612 [65 P. 1078]; 18 Cal.Jur.2d, Escheats, § 3, p. 270.) It was certainly within legislative discretion to effectuate this policy determination by the means chosen, despite some incidental benefit to certain individuals.

The remaining question which we face is that of the rights of the unknown heirs of the decedent. It is, of course, settled that when a decedent dies intestate, his heirs, both known and unknown, acquire an interest in his estate by operation of law at the moment of death, which interest cannot be divested by subsequent changes in the law of succession. (*Johns* v. *Scobie* (1939) 12 Cal.2d 618, 623 [86 P.2d 820, 121 A.L.R. 1404]; *Estate of Wellings* (1925) 197 Cal. 189, 194 [240 P. 21].) Invoking this rule of succession, the Attorney General argues as follows: Any distribution of Mrs. Nieto's estate pursuant to section 1027 to the State of California because of the absence of known heirs, made under the law in effect at the time of her death (see fn. 5, *ante,* and accompanying text) and thus prior to the 1969 amendment to section 228, would have accorded unknown heirs a period of five years after distribution in which to claim the estate before it permanently escheated. Therefore, so the argument runs, any distribution under the 1969

amendment of section 228 to the heirs of Mrs. Nieto's predeceased spouse, would divest the unknown heirs of the decedent of their "vested" right or entitlement to a period of five years in which to present their claims.

The argument rests on a misconception and is devoid of merit. ■ Unknown heirs of a decedent are not accorded a minimum period of five years in every case to claim an estate. Rather, section 1027 grants this extraordinary extension of time for presenting claims only in the context of a possible escheat. In other words, the special five-year period is merely a last-ditch legislative effort to protect these heirs from a permanent escheat. ■ "The very purpose of the escheat statute is to permit heirs who were unknown at the time of distribution to subsequently establish their right to property distributed to the State for lack of 'known heirs.' " (*Estate of Williams* (1940) 37 Cal.App.2d 181, 186 [99 P.2d 349].) Since, however, the 1969 amendment to section 228 provides that no escheat will occur if any heirs of decedent's predeceased spouse exist, the reason for providing an extra period of time in which to avert an escheat no longer exists.

■ All heirs are given ample opportunity to claim their portion of an estate during the normal period of administration. Unknown heirs who fail to come forward during this period cannot later complain of the distribution to other known heirs after it has become final in such an *in rem* proceeding (*Estate of Radovich* (1957) 48 Cal.2d 116, 120-121 [308 P.2d 14]; Code Civ. Proc., § 1908). ■ Since section 228 as amended in 1969 has eliminated the possibility of escheat where there are at least heirs of the decedent's predeceased spouse, any unknown heirs of the *decedent* are subjected to no additional disadvantage.[10]

■ We hold, therefore, that if no heirs of the decedent have appeared to claim the unallocated portion of the Nieto estate prior to distribution in the pending probate proceedings, the property should be finally and absolutely distributed to the heirs of the predeceased spouse, pursuant to the provisions of section 228, as amended.[11]

---

[10]For example, if in the normal probate case involving no escheat, distribution is made to a remote relative of the decedent as the only known next of kin, such distribution, upon becoming final in a regularly conducted proceeding free from fraud, will be conclusive upon the whole world, including nearer relatives of the decedent subsequently appearing. There is no reason to require a different rule in the case at bench.

[11]In so holding in the instant case, where there has been no distribution to the State of California pursuant to section 1027, we do not mean to suggest a different result where such distribution has already occurred, providing there has been no permanent escheat. (See Stats. 1968, ch. 1407, § 4.) In such situation, the rights of heirs of the predeceased spouse, as well as those of unknown heirs of the decedent, must be determined according to the provisions of the Unclaimed Property Act. (Code Civ. Proc., § 1300 et seq.)

Were we to hold otherwise, we would be placing the state in an anomalous position. During the five-year period reserved for claims by the unknown heirs, the state would be required to hold the unallocated portion of the estate, pursuant to section 1027, even though there would be no possibility of an eventual escheat. For five years the state would have to preserve the property, with resultant auditing and bookkeeping obligations, only to surrender it to petitioner's clients at the end of that period, should no heirs of Mrs. Nieto present claims. This burden seems to us purposeless and unreasonable.

█ It appears more consistent with normal probate procedures to conclude that if no heirs of the decedent appear by the time the estate is ready for distribution, their rights should be forfeit and the property distributed to the heirs of decedent's predeceased spouse, according to section 228.

Let a peremptory writ of mandate issue requiring respondent superior court, at the time it determines to distribute the residue of decedent's estate, to order distribution to the heirs of decedent's predeceased spouse pursuant to Probate Code section 228 as amended, unless known heirs of decedent are entitled thereto, in accordance with the views herein expressed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

The petition of the real party in interest for a rehearing was denied January 20, 1971.