[S.F. No. 23477. Apr. 27, 1977.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
CYNTHIA HARTWAY et al., Real Parties in Interest.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Martin S. Kaye, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

James C. Hooley, Public Defender, Michael G. Millman and Robert H. Betzenderfer, Assistant Public Defenders, Paul N. Halvonik, State Public Defender, and Clifton R. Jeffers, Chief Assistant State Public Defender, for Real Parties in Interest.

Ephraim Margolin, Nicholas Arguimbau, Margaret C. Crosby, Charles C. Marson, Alan L. Schlosser, Ellen Chaitin, Mark I. Soler, Amitai Schwartz Treuhaft, Walker, Brown & Cooper, Treuhaft & Walker, Mark I. Soler and Mary C. Dunlap as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**CLARK, J.**—The People petition for a writ of prohibition to prevent respondent superior court from enforcing its order directing that a peremptory writ of prohibition issue restraining the Municipal Court for the Oakland-Piedmont Judicial District from proceeding with prosecution of defendants, real parties in interest herein.

Defendants are women charged with soliciting or engaging in prostitution.[1] (Pen. Code, § 647, subd. (b).)[2] They moved in municipal court for dismissal of the charges on the grounds that section 647, subdivision (b), is unconstitutional on its face and as applied by the Oakland Police Department. The principal questions presented by the motion were: (1) whether the term "solicit" as used in the statute is unconstitutionally vague; and (2) whether the Oakland Police Department deliberately discriminates against women in enforcing the statute. After a thorough evidentiary hearing into the latter question, the municipal court filed comprehensive findings of fact and conclusions of law, resolving both questions against defendants, and denied the motion.

Upon application by defendants, respondent superior court then issued its writ restraining trial proceedings. Disagreeing with the trial court on both questions, respondent held: (1) section 647, subdivision (b), is unconstitutional on its face insofar as it prohibits soliciting an act of prostitution. The term "solicit" is too vague to provide fair notice of offending conduct, a requisite of due process under the federal and California Constitutions. However, the invalid solicitation provision is severable from the remainder of the statute, leaving intact the prohibition against engaging in an act of prostitution. (2) Section 647, subdivision (b), is also unconstitutional as applied by the Oakland Police Department. That department systematically discriminates against women in enforcing the statute, denying them equal protection of the law. The municipal court's contrary conclusion is not supported by the record.

Like the municipal court, and unlike respondent superior court, we find the challenged statute to be constitutional both on its face and as applied. Accordingly, we grant the People's petition for a peremptory writ of prohibition.[3]

---

[1] Approximately 252 individual actions are joined in this proceeding.

[2] Penal Code section 647 provides: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor:

" . . . . . . . . . .

"(b) Who solicits or who engages in any act of prostitution. As used in this subdivision, 'prostitution' includes any lewd act between persons for money or other consideration.

" . . . . . . . . . . . . . . . . . "

[3] Defendants contend that the People may not proceed by extraordinary writ because they have an adequate remedy by way of appeal. This question need not long detain us. The absence of another adequate remedy was determined by the Court of Appeal when it granted the alternative writ. (*Nathanson* v. *Superior Court* (1974) 12 Cal.3d 355, 361 [115 Cal.Rptr. 783, 525 P.2d 687]; *Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 686 [91 Cal.Rptr. 585, 478 P.2d 17].)

## Vagueness

■ The solicitation provision of section 647, subdivision (b), is not so vague as to deny an accused due process of law under the federal or California Constitutions.

■ The federal due process standard was recently restated in *Rose* v. *Locke* (1975) 423 U.S. 48 [46 L.Ed.2d 185, 96 S.Ct. 243]. Rejecting the contention that a statute prohibiting a "crime against nature" was unconstitutionally vague, the high court observed: "It is settled that the fair-warning requirement embodied in the Due Process Clause prohibits the States from holding an individual 'criminally responsible for conduct which he could not reasonably understand to be proscribed.' But this prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness for '[i]n most English words and phrases there lurk uncertainties.' Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden." (*Id.*, at pp. 49-50 [46 L.Ed.2d at p. 188], citations omitted.)

■ Similarly, under California law, " 'Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.' It will be upheld if its terms may be made reasonably certain by reference to other definable sources." (*American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4], citations omitted; see *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 673 [114 Cal.Rptr. 345, 522 P.2d 1345]; *People* v. *Victor* (1965) 62 Cal.2d 280, 300 [42 Cal.Rptr. 199, 398 P.2d 391].)

"Solicit" was defined in a related context—soliciting for a prostitute, i.e., pimping (Pen. Code, § 266h)—in *People* v. *Phillips* (1945) 70 Cal.App.2d 449 [160 P.2d 872]. " 'To tempt (a person); to lure on, esp. into evil, . . . to bring about, forth, on, etc., by gentle or natural operations; to seek to induce or elicit; . . .['] (Webster's New International Dictionary (2d ed.)[.)] 'To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat,

implore, or importune; to make petition to; to plead for; to try to obtain. ... While it does imply a serious request, it requires no particular degree of importunity, entreaty, imploration or supplication. . . .' (58 C.J. 804-805.)" (70 Cal.App.2d at p. 453.)

*Phillips* was among the sources this court relied upon in defining "solicit" in the context of an action to enjoin a former employee from soliciting customers of his former employer. " 'Solicit' is defined as: 'To ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.' (Black's Law Dictionary, 3d ed., p. 1639.) 'It implies *personal* petition and importunity. addressed to a particular individual to do some particular thing, . . .' (*Golden & Co.* v. *Justice's Court,* 23 Cal.App. 778, 798 [140 P. 49].) It means: 'To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain.' (*People* v. *Phillips,* 70 Cal.App.2d 449, 453 [160 P.2d 872].)" (*Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198, 203-204 [246 P.2d 11].)

Amici are critical of a portion of the *Phillips* definition which this court deleted in quoting from that case in *Aetna.* The passage in question defines "solicit" as: " 'To tempt (a person); to lure on, esp. into evil, . . . to bring about, forth, on, etc., by gentle or natural operations; to seek to induce or elicit; . . .[']" (*People* v. *Phillips, supra,* 70 Cal.App.2d at p. 453.) ▮ If merely "tempting" a person to engage in an act of prostitution constitutes solicitation within the meaning of section 647, subdivision (b), then, amici contend, one could be convicted for "waving to a passing vehicle, nodding to a passing stranger, or standing on a street corner in a miniskirt."

We agree that such conduct, per se, should not be deemed a violation of the statute. However, there is no evidence in this record that anyone has been arrested for, much less convicted of, soliciting an act of prostitution on the basis of such ambiguous conduct. To the contrary, the evidence indicates that persons arrested for this crime not only make their entreaties verbally, but, assuming one is familiar with their jargon, express themselves in language of brutal clarity.

Although most solicitations are verbal, we are not prepared to accept amici's suggestion that the concept be limited, for the purposes of this statute, to "verbal offers." If we so held, well-advised prostitutes would

immediately enroll in sign language courses. Nor are we willing to accept another of amici's suggestions—that solicitations be limited to offers specifying both price and services. There is a significant difference between avoiding the prohibited and evading the prohibition. The statute now satisfies due process by giving the innocent sufficient warning of that which is prohibited that they may avoid it. The "clarifications" sought by amici would simply give the guilty means of evading the prohibition.

■ "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." (*Colten* v. *Kentucky* (1972) 407 U.S. 104, 110 [32 L.Ed.2d 584, 590, 92 S.Ct. 1953].) ■ The challenged statute, insofar as it prohibits soliciting an act of prostitution, satisfies this standard.

## *DISCRIMINATORY ENFORCEMENT*

The Oakland Police Department, in enforcing section 647, subdivision (b), does not deliberately discriminate against women and thereby deny them equal protection of the law.

■ The Fourteenth Amendment to the United States Constitution and article I, section 7, subdivision (a), of the California Constitution prohibit all state action denying any person "equal protection of the laws."

In *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44], this court pointed out that although the great bulk of litigation under these constitutional provisions has recently focused upon the propriety of classifications in statutory enactments, this contemporary emphasis on the application of the equal protection doctrine to legislation should not obscure the fact that from the very inception of the Fourteenth Amendment, courts have recognized that the equal protection clause safeguards individuals from invidiously discriminatory acts of all branches of government, including the executive. We noted that as early as 1886, in *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064], the United States Supreme Court had applied the principles of the equal protection clause to the discriminatory enforcement of a San Francisco ordinance by administrative or executive officials. We rejected

the People's contention that the rationale of *Yick Wo* did not extend to the enforcement of penal statutes. We held that a criminal defendant may object to the maintenance of a prosecution on the ground of deliberate invidious discrimination in the enforcement of the law and we further held that the objection should be raised, as it has been here, in a pretrial motion to dismiss. (*Murgia* v. *Municipal Court, supra,* at pp. 293-301.) We did not in *Murgia* have occasion to consider all of the classifications that may be arbitrary for the purposes of a discriminatory enforcement claim, but it is clear that in California sex is such a classification (see *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]), and we do not understand the People to contend otherwise.

■ Like the ordinance in *Yick Wo,* the statute challenged here is "fair on its face and impartial in appearance." (*Yick Wo* v. *Hopkins, supra,* 118 U.S. at p. 373 [30 L.Ed. at p. 227].) Section 647, subdivision (b), by its terms applies to "*Every person* . . . [w]ho solicits or who engages in any act of prostitution." (Italics added.) The statute is clearly designed to punish specific acts without reference to the sex of the perpetrator. (*Leffel* v. *Municipal Court* (1976) 54 Cal.App.3d 569, 575 [126 Cal.Rptr. 773].) However, equal protection of the law may be denied by a statute fair on its face and impartial in appearance if it is applied "with an evil eye and an unequal hand." (*Yick Wo* v. *Hopkins, supra,* 118 U.S. at pp. 373-374 [30 L.Ed. at p. 227]; see *Murgia* v. *Municipal Court, supra,* 15 Cal.3d at p. 295.) Defendants contend that the Oakland Police Department so applies this statute.

■ Because of the presumption that official duty has been properly, hence constitutionally, performed (Evid. Code, § 664), the defendant has the burden of proof in establishing the defense of discriminatory enforcement of the law. (*Murgia* v. *Municipal Court, supra,* 15 Cal.3d at p. 305; *People* v. *Sperl* (1976) 54 Cal.App.3d 640, 657 [126 Cal.Rptr. 907]; *People* v. *Gray* (1967) 254 Cal.App.2d 256, 265 [63 Cal.Rptr. 211].)

■ The elements of the defense of discriminatory enforcement were set forth in *Murgia* v. *Municipal Court, supra.* To establish the defense, the defendant must prove: (1) "that he has been deliberately singled out for prosecution on the basis of some invidious criterion;" and (2) that "the prosecution would not have been pursued except for the discriminatory design of the prosecuting authorities." (15 Cal.3d at p. 298.)

Defendants allege that the Oakland Police Department engages in the following practices which, defendants contend, manifest a policy of deliberate discrimination against women in enforcing section 647, subdivision (b).

1. More men than women are employed as "decoys" for solicitation of acts of prostitution with the result that more female prostitutes than male customers are arrested for that crime.

2. In "trick" cases, the female prostitute, but not the male customer, is arrested even if his culpability is as great as, or greater than, hers.[4]

3. If the man is arrested in a trick case, he is merely cited, i.e., released with a written notice to appear in court, whereas the woman is subjected to custodial arrest.

4. Female prostitutes are quarantined when arrested whereas their male customers are not so restrained.

### Decoy Cases

The record establishes that the Oakland Police Department does employ more men than women as decoys for solicitation of acts of prostitution and that, as a result of this practice, the department does arrest more female prostitutes than male customers for this crime.[5] The critical question is whether the department adopted this practice—employing more men than women as decoys—with intent to discriminate against women. After a thorough evidentiary hearing into this matter of fact, the municipal court found that the practice was not adopted with such intent. It found, instead, that the practice is a consequence of the department's sexually unbiased policy of concentrating its enforcement effort on the "profiteer," rather than the customer of commercial vice. This dispositive finding of fact is amply supported by substantial evidence. Therefore, under settled principles of

---

[4] "Trick" may refer to either the act of prostitution or the customer. Trick cases are to be distinguished from decoy cases. In decoy cases, one of the parties to a solicitation, either the apparent prostitute or the apparent customer, is an undercover vice officer. In trick cases, neither party is an undercover vice officer.

[5] In 1973 and 1974, 1,160 women were arrested by means of male decoys and 57 men were arrested by means of female decoys.

review, neither the superior court nor this court may reweigh the evidence in order to come to the contrary conclusion.[6]

The subdivision of the Oakland Police Department having special responsibility for the enforcement of section 647, subdivision (b), is the vice control unit; this unit is also responsible for combatting illegal narcotics and gambling. For the purposes of this discussion, each of these criminal subcultures—prostitution, narcotics and gambling—may be thought of as pyramidal in structure. In narcotics, for example, the base of the pyramid is formed by users of illicit narcotics. The remainder of the structure is composed of providers of the contraband. The providers, from the major distributor at the apex of the triangle to the street dealer, are "profiteers" in the parlance of the vice control unit, i.e., they profit financially from the illicit commerce. An analogous structure can be perceived in prostitution. The customer forms the base of the triangle; the prostitute, male or female, constitutes the largest class of profiteers; and at the apex are the pimp, the panderer, and the bar, restaurant, hotel and motel proprietors who knowingly derive profit from the vicious trade.

In order to most efficiently utilize its limited resources, the vice control unit concentrates on the profiteers in each vice with special emphasis on those at the apex of the illicit commerce. It is a matter of common knowledge of which we may take judicial notice that most law enforcement agencies—federal, state and local—endorse this approach with respect to narcotics. Although both parties to an illicit narcotics transaction break the law, as do both parties to an act of prostitution, no one seriously suggests that it is inappropriate for a law enforcement agency to concentrate on the profiteer and to carry out this policy by, among other things, using its undercover officers as decoys to arrest sellers rather than buyers. The record supports the municipal court's conclusion that the Oakland Police Department adopted a profiteer-oriented approach to prostitution in good faith and not as a smokescreen for deliberate discrimination against women.

---

[6]"Judgments and orders of a municipal court, just as those of a superior court, are presumed correct; and a reviewing court will not disturb factual determinations expressly or impliedly made as an incident to a judgment or order, if they are supported by any substantial evidence. . . . [¶] Normally judgments and orders of the municipal court are reviewed by appeal to the appellate division of the superior court. The extraordinary remedy of mandamus will, however, lie where the remedy of appeal is inadequate . . . . In such a case therefore, the writ procedure takes the place of the appeal and is governed by the same principles as to scope of review. The higher court reviews the action of the inferior court, on the record made in the inferior court, and determines if discretion has been abused." (*Winton* v. *Municipal Court* (1975) 48 Cal.App.3d 228, 236-237 [121 Cal.Rptr. 561], citations omitted.)

In terms of personnel hours expended, 60 percent of the time allotted to prostitution is devoted to investigating pimps, panderers, and bar, restaurant, motel and hotel proprietors. Prostitutes, male and female, receive 30 percent of the unit's attention and customers are the subject of the remaining 10 percent. Because 95 percent of the pimps, etc., are male, as are 10 percent of the prostitutes and all of the customers, it is clear that the vice control unit devotes at least half of its resources to prosecuting men.

It is by no means certain that employing more male than female undercover officers as decoys for solicitation is the most efficient use of this limited resource in fighting prostitution. However, on the available evidence, the Oakland Police Department could in good faith come to this conclusion. Prostitutes, the municipal court found, average five customers per night; the average customer does not patronize prostitutes five times a year. Because of an effective grapevine, arrest of one prostitute by an undercover officer will deter others, at least for a time. Customers, on the other hand, are usually unknown to one another. Therefore, in the absence of widespread publicity, arrest of one customer will not deter others. Finally, using female decoys is twice as "expensive" as using males because an additional officer is required under current practice to ensure the female's safety.

Even assuming arguendo that using more male than female decoys is a manifestation of a policy of deliberate discrimination against women, defendants have not established the other element of a discriminatory enforcement defense—that they would not have been arrested but for this policy. To the contrary, substantial evidence supports the municipal court's conclusion that "[t]he Oakland Police Department made arrests for violations of section 647 [subdivision] (b) Penal Code based upon probable cause to believe the arrestee has committed the offense and not on the basis of the sex of the arrestee."

### Trick Cases

In trick cases,[7] defendants allege, the Oakland Police Department arrests the woman, but not the man, even if his culpability is as great as, or greater than, hers.

In support of this allegation, defendants introduced evidence of six trick cases in which the woman was arrested for solicitation while the

---

[7]See footnote 4.

man was set free. In rebuttal, the People introduced evidence of four trick cases in which the man was arrested.[8] Having judged the credibility of the witnesses, resolved any conflicts in their testimony, weighed the evidence and drawn factual conclusions, the municipal court found there was "absolutely no [sexual] discrimination whatsoever." As to one of defendants' six cases, the court did find there was probable cause to arrest the man as well as the woman. However, the court found that failure to arrest the man in this case was not a manifestation of a policy of deliberate discrimination against women. To the contrary, as has been stated, the court found that "[t]he Oakland Police Department made arrests for violations of section 647 [subdivision] (b) Penal Code based upon probable cause to believe the arrestee has committed the offense and not on the basis of the sex of the arrestee." Having carefully reviewed the record, we conclude that ample evidence supports this conclusion.

### Arrest Procedures

■ Prior to 29 March 1975, the customary practice of the Oakland Police Department was to custodially arrest the prostitute—male and female alike—and cite the customer, i.e., release him with a written notice to appear in court pursuant to section 853.6 of the Penal Code. Since 29 March 1975, all prostitution arrests have been custodial.[9]

The municipal court concluded that the previous practice was not a manifestation of a policy of deliberate discrimination against women. The most obvious ground for this conclusion is that male and female prostitutes were treated alike in this regard. However, the court also based its conclusion on a finding that prostitutes, unlike their customers, did not ordinarily satisfy the standards for release pursuant to section 853.6. This finding is amply supported by the evidence. The criteria for releasing a misdemeanor arrestee pursuant to section 853.6 are set forth in subdivisions (i) and (j) of that section. Under subdivision (j), if he does not cite and release the arrestee, the officer is to indicate, on a form provided for that purpose, the reason or reasons for maintaining custody. The standard reasons include: "The person could not provide satisfactory evidence of personal identification." (*Id.*) Under subdivision (i), if a misdemeanor arrestee is not released prior to booking, a "background"

---

[8]In two of the four cases, both the man and the woman were arrested for engaging in an act of prostitution. In the remaining two cases, the man was arrested for soliciting an act of prostitution while the woman was set free.

[9]This change in practice was, apparently, in response to a court order in another case.

investigation is then to be conducted into his eligibility for release. The pertinent information includes "name, address, length of residence at that address, length of residence within this state, marital and family status, employment, length of that employment, prior arrest record." (*Id.*) Between 26 February 1975 and 23 April 1975, 109 female prostitutes were arrested. Of the 109, 20 had no identification or refused to identify themselves, 13 had aliases or suspect identification, 29 had no permanent address, 30 were not permanent residents of the area, 34 had no relatives in the area, 74 were not regularly employed, and 50 had prior arrests or convictions for prostitution. During the same period, 24 male customers were arrested. Of the 24, all had reliable identification, only one had no permanent address, only two were not permanent residents of the area, only two had no relatives in the area, all were regularly employed, and only one had a prior criminal history indicating that he was a poor citation risk.

### Quarantine

■ In the ordinary course of events, when weekends and holidays did not intervene, a female prostitute was tested for gonorrhea and syphilis the morning after her arrest. The result of the gonorrhea test was available the following morning. If the test was negative, she was released from quarantine. If the test was positive, she was given penicillin and then released from quarantine. In either case she was encouraged to return voluntarily to a clinic in a few days to obtain the result of the syphilis test. The procedure was the same for a male prostitute except that he was released from quarantine earlier because the test for gonorrhea in the male yields results more quickly. Customers were not quarantined. The quarantine procedure was discontinued on 21 April 1975 because of a significant decline in the gonorrhea infectivity rate among female prostitutes and because voluntary programs had become the preferred alternative among California public health officials.

The municipal court concluded that the previous practice—quarantining prostitutes while not so restraining their customers—was not a manifestation of a policy of deliberate discrimination against women by the Oakland Police Department. This conclusion was based on a finding that female prostitutes were more likely than their male customers to communicate venereal diseases. This finding was amply supported by the following evidence: Whereas the venereal disease rate for the general population was 4 percent, the infectivity rate among quarantined female

prostitutes was 22 percent for gonorrhea alone. A female prostitute has a greater number of sexual contacts than does her male customer. Because females are more likely to be asymptomatic for gonorrhea, they are less likely to seek treatment for it.

However, the most obvious ground for the trial court's conclusion that the quarantine procedure was not a manifestation of a policy of deliberate discrimination against women is, again, that male and female prostitutes were, essentially, treated alike under the program. The distinction was not between male and female, but between prostitute and customer.

Finally, the quarantine procedure was the responsibility—not of the police or of the prosecutor—but of the public health officials. (See Health & Saf. Code, § 3195.) Therefore, its relevance to a claim of deliberate discrimination on the part of the police is highly questionable.

Let the peremptory writ of prohibition issue as prayed.

Mosk, J., Richardson, J., and Sullivan, J.,* concurred.

**TOBRINER, Acting C. J.**—I dissent. Despite the clear language of Penal Code section 647, subdivision (b), prohibiting the solicitation of acts of prostitution by both men and women, customers and prostitutes, the majority today holds that the Oakland police may effectively ignore a sex-neutral statutory mandate by directing its enforcement effort primarily against women. The deliberate failure to enforce the law against male customers cuts the intended coverage of section 647, subdivision (b) in half. In my view, the superior court properly found that the challenged enforcement policy constitutes invidious sex-based discrimination in violation of the equal protection guarantees of the United States and California Constitutions.

It has, of course, long been established that the discriminatory enforcement of an otherwise valid statutory prohibition constitutes a violation of the Fourteenth Amendment. As the United States Supreme Court declared almost a century ago in *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 373-374 [30 L.Ed. 220, 227, 6 S.Ct. 1064]: "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." And, more recently, in *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44], this court unanimously held that a defendant subjected to such discriminatory enforcement may raise such discrimination as a defense to a criminal prosecution.

In the instant case, defendants presented a wealth of statistical evidence which established beyond question that the procedures employed by the Oakland police in enforcing the prostitution solicitation law have resulted in the arrest of a significantly disproportionate number of women, as compared to men. Indeed, the police do not deny that by consciously choosing to employ primarily male decoys, they virtually assured that most of the law violators apprehended would be women, not men. The superior court concluded that this practice constituted invidious, constitutionally proscribed discrimination.

The majority argue, however, that the real parties have failed to demonstrate that the challenged police enforcement policies were motivated by "an intent to discriminate against women." According to the majority, the disparate treatment of the sexes is simply "a consequence of the department's sexually unbiased policy of concentrating its enforcement effort on the 'profiteer' rather than the customer of commercial vice." (*Ante,* p. 349.)

In reaching this conclusion, I believe that the majority err in two respects. First, the majority mistakenly equate concentration of law enforcement efforts on sellers of illegal narcotics with the similar focus of enforcement procedures on the "profiteer" in prostitution transactions. In the case of narcotics transactions the Legislature itself has drawn a distinction between buyers and sellers, and has endorsed the policy of concentrating police resources on the apprehension of sellers. (See Health & Saf. Code, §§ 11350 (possession); 11351 (possession for sale); and 11352 (sale).)

But the Legislature specifically refused to draw such a distinction between prostitutes and their customers in defining the offense of solicitation. (Pen. Code, § 647, subd. (b).) As the Court of Appeal noted in *Leffel* v. *Municipal Court* (1976) 54 Cal.App.3d 569, 575-576 [126 Cal.Rptr. 773]; "The words 'every person . . . who solicits . . . any act of prostitution' are clear and unambiguous. 'Every' means 'each and all

within the range of contemplated possibilities' (Webster's New Internat. Dict. (3d ed. 1961) Unabridged, p. 788.) . . . Thus the ordinary meaning of the statute is that *all persons,* customers as well as prostitutes, who solicit an act of prostitution are guilty of disorderly conduct . . . . [T]his interpretation is consistent with the legislative purpose and policy behind the statute. [Citation.] The Legislative purpose . . . is to eliminate prostitution and its attendant evils. *Subjecting the customer to prosecution will further the legislative purpose—probably more so than any other legislative remedy."* (Italics added.)

Despite the clear legislative mandate to arrest and prosecute customers as well as prostitutes, the Oakland police have adopted an enforcement policy that directly contravenes the judgment of the Legislature. Although the police unquestionably may exercise discretion in the allocation of scarce resources, such discretion is not so unbridled as to permit the police to carve out invidious exceptions to a statutory prohibition, exceptions which the Legislature has specifically declined to enact. As the court noted in *People* v. *Gray* (1967) 254 Cal.App.2d 256, at page 266 [63 Cal.Rptr. 211]: "[T]he recognition of the discriminatory enforcement of a penal law as a defense to a criminal action is one of the few means the individual citizen has to force public officials to do their job properly. . . . The availability of discriminatory enforcement as a defense . . . serves a good purpose; it acts as a constant reminder to the executive that the will of the people, expressed through the legislative branch, should be obeyed." Thus, just as the police "may not enforce a facially fair gambling statute as if it were explicitly directed only at blacks" (*Murgia* v. *Municipal Court, supra,* 15 Cal.3d 286, 296 (citing *People* v. *Harris* (1960) 182 Cal.App.2d Supp. 837 [5 Cal.Rptr. 852] and *People* v. *Winters* (1959) 171 Cal.App.2d Supp. 876 [342 P.2d 538])), they may not enforce a facially fair solicitation statute as if it were directed only at women.

In addition to drawing an inappropriate analogy to the enforcement of drug laws, the majority err in accepting at face value the People's contention that the challenged "profiteer—oriented" enforcement policy bears no relation to traditional sex-based stereotypes but instead simply represents the most efficient means of reducing the incidence of prostitution. (Cf. *Castaneda* v. *Partida* (1977) 430 U.S. 482, 492 [51 L.Ed.2d 498, 509, 97 S.Ct. 1272].) Several centuries of law enforcement history belie any claim that a "profiteer"-directed enforcement program is an effective

means of eliminating prostitution, and the record in the instant case demonstrates quite unmistakenly that the arrest of male customers in addition to female prostitutes is a singularly more effective law enforcement strategy than the approach traditionally employed by the police.

From February 26, 1975, through April 22, 1975, the Oakland police were compelled by order of the Alameda County Superior Court to employ female decoys and to arrest male customers guilty of section 647, subdivision (b) violations. (Riemer v. Jensen, No. 455371-9.) During this brief period of even-handed enforcement, the arrest of male customers, coupled with newspaper publicity surrounding the sex-neutral police procedures, resulted, according to the testimony of the senior vice squad officer, in a "devastating" reduction in observed levels of prostitution related offenses. Similar results have been achieved in other jurisdictions in which enforcement efforts have been directed at male customers as well as female prostitutes. (See, e.g., *United States* v. *Moses* (D.C. App. 1975) 339 A.2d 46; Kanowitz, Women and the Law (1969) p. 17. See generally Jennings, *The Victim as Criminal: A Consideration of California's Prostitution Law* (1976) 64 Cal.L.Rev. 1235.)

In light of the demonstrated success of an enforcement policy which encompasses both customers and prostitutes, I cannot accept the suggestion that the police department's resumption of its traditional enforcement policy, directed primarily at women, is explicable by reference to legitimate law enforcement objectives. Although the majority discern no discriminatory intent in the action of the Oakland police, I agree with the American Bar Association's section of Individual Rights and Responsibilities which has characterized such police practices as "one of the most direct forms of discrimination against women in this country today. In accordance with society's double standard of sexual morality, the woman who sells her body is punished criminally and stigmatized socially while her male customer . . . is left unscathed." (ABA Section of Individual Rights and Responsibilities, Rep. to House of Delegates, Rep. No. 101B, p. 1 (1974).)

More than a half century ago, a New York court observed: "The men create the market, and the women who supply the demand pay the penalty. It is time this unfair discrimination and injustice should cease." (*People* v. *Edwards* (N.Y. Co. Ct. 1920) 180 N.Y.S. 631, 634-635.)

Hopefully, it will not be yet another half century before this discriminatory practice is eliminated.

I would deny the requested writ.

Wright, J.,* concurred.

The petition of the real parties in interest for a rehearing was denied May 26, 1977. Bird, C. J., and Tobriner, J., were of the opinion that the petition should be granted.

---

*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.